**John STAGIKAS, Plaintiff,**

v.

**SAXON MORTGAGE SERVICES, INC., Defendant.**

**Civil Action No. 10–40164–FDS.**

United States District Court,
D. Massachusetts.

July 5, 2011.

Josef C. Culik, Culik Law P.C., Beverly, MA, for Plaintiff.

Andrew M. Schneiderman, Maura K. McKelvey, Hinshaw & Culbertson LLP, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

SAYLOR, District Judge.

This dispute arises out of a government program to promote the modification of

home mortgage loans to avoid foreclosure. Defendant Saxon Mortgage Services, Inc., acting as servicer for the Federal Home Loan Mortgage Corporation ("Freddie Mac"), participates in the Home Affordable Modification Program, a federal program designed to reduce foreclosures. As part of the program, Saxon signed a Trial Period Plan agreement ("TPP") with plaintiff John Stagikas. The complaint contends that the TPP was a binding contract between the parties, under which Saxon was obligated to offer a permanent loan modification if Stagikas complied with the TPP's terms and conditions over a three-month trial period. Stagikas contends that he complied with his obligations under the TPP, and that Saxon did not. The complaint alleges breach of contract, violations under Mass. Gen. Laws ch. 93A, and numerous violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692a–1692p. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1367.

Defendant has moved to dismiss under Fed.R.Civ.P. 12(b)(6). For the following reasons, the motion will be granted in part and denied in part.

1. Although some of the information in this section is not explicitly cited in the complaint, the guidelines are matters of public record and may therefore be considered here. *See In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 19 (1st Cir.2003) ("[M]atters of public record are fair game in adjudicating Rule 12(b)(6) motions, and a court's reference to such matters does not convert a motion to dismiss into a motion for summary judgment.").

2. The statute contains an identical directive for any federal property managers who own or control mortgages and mortgage-backed securities. *See* 12 U.S.C. § 5220(b)(1). It further defines "modifications" to include "reduction in interest rates; ... reduction of loan principal; and ... other similar modifications." *Id.* § 5220(b)(2).

# I. *Statutory Framework*

## A. *The Home Affordable Mortgage Program*

Congress enacted the Emergency Economic Stabilization Act in the midst of the financial crisis of 2008. *See* Pub.L. No. 110–343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §§ 5201–5253).[1] The centerpiece of the statute was the Troubled Asset Relief Program ("TARP"), through which the Secretary of the Department of the Treasury was delegated broad powers to mitigate the financial impact of the foreclosure crisis and preserve homeownership. 12 U.S.C. §§ 5201, 5211–5241. One component of TARP requires the secretary to "implement a plan that seeks to maximize assistance for homeowners and ... encourage the servicers of the underlying mortgages ... to take advantage of ... other available programs to minimize foreclosures." *Id.* § 5219(a).[2] Congress also granted the secretary authority to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." *Id.*[3]

■ Acting under this authority, the Secretary of the Treasury announced the "Making Home Affordable Program" in February 2009.[4] One sub-part of this

3. Section 5219(c) of the statute, entitled "Consent to Reasonable Loan Modification Requests," provides:

Upon any request arising under existing investment contracts, the Secretary shall consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures, including term extensions, rate reductions, principal write downs, increases in the proportion of loans within a trust or other structure allowed to be modified, or removal of other limitation on modifications.

12 U.S.C. § 5219(c).

4. The Department of the Treasury created the "Making Home Affordable Program" jointly with the Federal Housing Finance Agency, the Federal National Mortgage Association ("Fannie Mae"), and Freddie Mac. *See*

program is the "Home Affordable Mortgage Program" ("HAMP"). The goal of HAMP is to provide relief to borrowers who have defaulted or are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt. *See* U.S. Dep't of the Treasury, Supplemental Directive 09–01, *available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf. Under HAMP, loan servicers are provided with $1,000 incentive payments for each permanent mortgage-loan modification completed. These modifications proceed under a uniform process designed to identify eligible borrowers and render their debt obligations more affordable and sustainable.

The Department of the Treasury has issued a series of directives that provide guidance to servicers implementing HAMP. Under these guidelines, mortgage servicers are directed to identify and solicit borrowers who are in default on their mortgage payments, or soon will be. *See id.* Within this group, borrowers may be eligible for a loan modification under HAMP if the mortgage loan originated before January 1, 2009; if the mortgage is secured by the borrower's primary residence; and if the mortgage payments amount to more than 31 % of the borrower's monthly income. *Id.* at 2.[5] To participate in HAMP, borrowers must submit an affidavit documenting financial hardship. *Id.* at 3. In addition, the servicer must

conduct a Net Present Value ("NPV") test, which assesses whether it would be more advantageous to foreclose or to modify the terms of the first-lien loan. *Id.* at 3–5.

If the homeowner qualifies under these eligibility criteria, the servicer may offer the homeowner a TPP agreement. *Id.* at 5–6. Under the TPP, the borrower pays modified mortgage payments calculated based on the financial documentation submitted during the eligibility phase. The homeowner is also required to open an escrow account and submit additional financial documents, and may be required to undergo credit counseling. The trial period lasts for three months. *See id.* at 17. As long as the borrower has complied with the terms of the TPP and the income representations have been verified, the servicer is directed to offer the borrower a permanent modification at the end of the three-month period. *See id.* at 18.[6] SD 09–01 anticipates that the servicer will verify the borrower's representations regarding his or her income during the trial period. *See id.*

### B.  *Contractual Language in the Trial Period Plan Agreements*

The government created one uniform agreement to be executed by servicers and eligible borrowers. The TPP is a four-page document and "has the appearances of a contract." *Durmic v. J.P. Morgan Chase Bank, N.A.*, 2010 WL 4825632, at *1 (D.Mass. Nov. 24, 2010).[7] The first sentence of the TPP provides:

---

*Williams v. Geithner*, 2009 WL 3757380, at *2 (D.Minn. Nov. 9, 2009).

5.  There are several other eligibility requirements. Among other things, the mortgage loan must be secured by property containing no more than four units, and, depending on the number of units, the guidelines set ceilings on the unpaid principal balance. *See id.* at 2–3.

6.  SD 09–01 provides, "If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will

become effective on the first day of the month following the trial period as specified in the Trial Period Plan." *Id.* at 18.

7.  As Judge Stearns noted in *Durmic*, the TPP "characterizes itself as an agreement, contains signature lines for the Lender and the Borrower and includes distinctly contractual phrases such as 'under seal' and 'time is of the essence.'" 2010 WL 4825632 at *1 n. 4.

If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

(Compl. Ex. A). Four sentences later, the TPP states, "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer." (*Id.*).

Section 2 of the TPP sets forth the amount and date of each monthly payment, and states that "TIME IS OF THE ESSENCE under this Plan." (*Id.* ¶ 2). It next details three conditions under which the TPP would not result in a permanent modification: if, prior to the Modification Effective Date, (1) if the Lender does not provide the borrower with a fully executed copy of the plan and permanent modification agreement, (2) if the borrower does not make all payments provided under the plan, or (3) if the financial representations made in the eligibility assessment stage are no longer correct. (*See id.* ¶ 2(F)).

Section 3 explains how the permanent loan modification will be calculated. It then provides:

If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Docu-

ments as necessary to reflect this new payment amount. . . .

(*Id.* ¶ 3).

## II. *Factual Background*

The following factual allegations are drawn from the complaint.

Plaintiff John Stagikas purchased his home in 2005. On February 22, 2006, he refinanced his home with a loan in the amount of $334,500. Freddie Mac owns the loan, and defendant Saxon Mortgage Services, Inc., is the servicer.

In January 2009, Stagikas began to fall behind on his monthly payments. After determining that he was eligible for loan modification, Saxon and Stagikas signed a TPP in late September or early October 2009. (Compl. ¶¶ 26, 29, Ex. A).[8] Stagikas was required, among other things, to make three reduced payments of $1,123.75; provide accurate financial information to Saxon; and submit to credit counseling on request. (*See id.* Ex. A). Stagikas complied with the requirements of the TPP, but Saxon declined to offer him a permanent loan modification. (*Id.* ¶¶ 31–32). Saxon then initiated foreclosure proceedings against Stagikas's home. (*Id.* ¶ 53).

On June 18, 2010, Stagikas sent Saxon a demand letter pursuant to Mass. Gen. Laws ch. 93A. The letter requested, among other things, that Saxon disclose the NPV data used to evaluate him for the loan modification. (*Id.* Ex. B). Saxon did not respond. (*Id.* ¶ 35).

Stagikas filed the present action on August 24, 2010. Saxon has moved to dismiss for failure to state a claim upon which relief can be granted.

---

**8.** Although it is unclear who the predecessor lender or servicer was, the complaint states that Stagikas's loan "was in default at the time Saxon began servicing it." (*Id.* ¶ 45).

## III. *Standard of Review*

On a motion to dismiss under Fed. R.Civ.P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir.2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir.1999)). To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S.Ct. 1955 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 84 (1st Cir.2008) (quotations and original alterations omitted).

## IV. *Analysis*

The complaint's core allegations are that the TPP is a binding contract, and that defendant has breached that contract. Plaintiff has brought four claims: (1) breach of contract, (2) violation of Mass. Gen. Laws ch. 93A; (3) improper communication with a consumer under 15 U.S.C. § 1692c; and (4) unfair debt collection practices under 15 U.S.C. § 1692f. He

seeks specific performance, damages, costs, and attorney's fees.

Defendant raises two principal defenses: first, that plaintiff lacks standing to assert a cause of action based on a TPP, and second, in the alternative, that the TPP is unenforceable due to lack of consideration.

### A. *Standing*

Defendant first contends that plaintiff lacks standing to bring this suit because the HAMP guidelines do not extend a private right of action to borrowers. Defendant acknowledges that plaintiff has not brought any claims under HAMP, but contends that plaintiff is attempting to use state law as an indirect means to enforce HAMP.

██ HAMP does not create a private right of action for borrowers. *See, e.g., Acuna v. Chase Home Fin., LLC*, 2011 WL 1883089, at *4 (E.D.Va. May 17, 2011) ("It is well-settled that borrowers do not have a private right of action under HAMP."); *Hart v. Countrywide Home Loans, Inc.*, 735 F.Supp.2d 741, 748 (E.D.Mich.2010); *Speleos v. BAC Home Loans Servicing, L.P.*, 755 F.Supp.2d 304, 311 (D.Mass.2010) ("[T]here is no private right of action under HAMP."); *Hoffman v. Bank of Am., N.A.*, 2010 WL 2635773, at *2 (N.D.Cal. June 30, 2010); *Simon v. Bank of Am., N.A.*, 2010 WL 2609436, at *10 (D.Nev. June 23, 2010).[9]

██ Whether HAMP creates a private right of action, however, is not the issue in this case. Plaintiff has brought suit on the theory that the TPP constituted a contract between defendant and plaintiff, and that defendant breached that contract. His claims therefore arise under defendant's alleged failure to comply with its contrac-

---

9. In lieu of creating a private right of action, the federal government expressly delegated HAMP–compliance authority to Freddie Mac.

*Marks v. Bank of Am., N.A.*, 2010 WL 2572988, at *6 (D.Ariz. June 21, 2010).

tual obligations. *See Durmic*, 2010 WL 4825632 at *2 n. 9.

Defendant contends that because the TPP originated out of the HAMP program, plaintiff cannot vindicate any rights that relate to HAMP. That argument is without merit. Defendant does not contend that HAMP or the HAMP guidelines preempt state-law contract actions. Indeed, the Court is aware of no precedent for the proposition that, as a general matter, a contract's relationship to federal law requires the dismissal of any state-law claims that arise under it. The fact that the TPP is a form contract created by the government makes no difference. If the TPP is properly construed as a contract between the parties in this case, then plaintiff has standing to bring suit in order to recover for any breach of that contract.

## B. *Breach of Contract*

In order to assert a claim for breach of contract in Massachusetts, plaintiff must allege "that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 316 (D.Mass.1997) (citations omitted). The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration. *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 31–32 (1st Cir.1988); RESTATEMENT (SECOND) OF CONTRACTS § 17. Defendant contends that the TPP is not an enforceable contract because it lacks consideration.

A contract supported by consideration contains a "bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor." *Durmic*, 2010 WL 4825632 at *3 (quoting *Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004)). Invoking the pre-existing duty

rule, defendant contends that because plaintiff's partial monthly mortgage payments under the TPP went towards satisfying his undisputed pre-existing mortgage loan obligations, the TPP payments cannot constitute new bargained-for consideration. *See In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir.1980).

Defendant is correct that modified mortgage payments, standing alone, would likely not constitute cognizable consideration under the TPP. Plaintiff's legal detriment, however, consisted of more than the modified monthly payments. As Judge Stearns noted in *Durmic*, "[u]nder the TPP, [plaintiffs] were required to provide documentation of their current income, make legal representations about their personal circumstances, and agree to undergo credit counseling if requested to do so. . . . Plaintiffs could also be required to make payments into a newly established escrow account." 2010 WL 4825632 at *3. These conditions of the TPP all constitute new legal detriments to plaintiff that flowed from his acceptance of the TPP. *See Wit v. Commercial Hotel Co.*, 253 Mass. 564, 572, 149 N.E. 609 (1925) ("The detriment to the promisee need not be real. It means giving up something which he had a right to keep, or doing something which he had a right not to do."). Accordingly, plaintiff has made sufficient allegations that the TPP was supported by consideration. As a result, the motion to dismiss the contract claim will be denied.

## C. *Chapter 93A Claim*

Plaintiff's chapter 93A claim rests entirely on defendant's alleged failure to abide by the TPP. The complaint alleges that "[d]espite Stagikas's complete compliance with all material terms of the agreement, Saxon failed to give the promised performance and permanently modify Stagikas's mortgage loan . . . . [and this] fail-

ure to evaluate Stagikas for HAMP is an unfair or deceptive practice in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A." (Compl. ¶¶ 32–33). Defendant responds with two arguments: first, that a chapter 93A claim must allege more than mere breach of contract, and second, that plaintiff suffered no harm in any event.[10]

■ Defendant is correct that a mere breach of contract is insufficient to sustain a chapter 93A claim. *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir.2000); *see Stonehill College v. Mass. Comm'n Against Discrimination*, 441 Mass. 549, 582, 808 N.E.2d 205 (2004) (dictum) (describing category of cases "based on a breach of contract, with some egregious circumstance surrounding that breach providing the further ingredient of 'unfairness' to make out a G.L. c. 93A claim"). However, a party who breaches a contract in a deliberate attempt to obtain the benefits of the contract, and to avoid fulfilling its own obligations under it, may have committed an unfair or deceptive act under chapter 93A. *See, e.g., Ecological Fibers, Inc. v. Kappa Graphic Bd., B.V.*, 345 F.Supp.2d 13, 15–16 (D.Mass.2004) (complaint stated chapter 93A violations where defendant entered into an agreement and never intended to carry out its terms, but rather entered into it for the purpose of obtaining information about and soliciting plaintiff's customers); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475, 583 N.E.2d 806 (1991) (complaint stated chapter 93A violation where owner withheld approval of development plan in an attempt to force developer to increase compensation to owner beyond what contract required).

■ Although the question is not free from doubt, the allegations in the complaint appear to state a claim for unfair or deceptive practices under chapter 93A. The complaint alleges that plaintiff was led to believe that he would be entitled to a permanent loan modification if he complied with his obligations under the TPP, and was "induce[d]" into making three loan payments. (Compl. ¶ 30). It also appears to allege that defendant refused to provide the data used in its calculation of eligibility. (*See id.* Ex. B at 3). And it alleges that defendant "disregarded" the agreement, refused to modify the loan, and instead initiated foreclosure proceedings. (*Id.* ¶¶ 1, 53). At this stage in the litigation, that is enough to sustain the claim.[11] Whether, of course, the actual evidence will show merely a breach of contract is a question for another day.

The complaint also alleges several injuries resulting from defendant's allegedly deceptive representations about plaintiff's HAMP eligibility, including increased interest on the debt, a negative impact on plaintiff's credit history, and the loss of other economic benefits of the loan modification. (*See id.* ¶ 36). That is enough to sustain a claim of injury under chapter 93A. *See Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 255 (1st Cir. 2010) ("[I]njury under chapter 93A means economic injury ..."); *Hershenow v. Enter. Rent–A–Car Co. of Boston*, 445 Mass. 790, 800, 840 N.E.2d 526 (2006) (injury requirement is satisfied when plaintiff is placed "in a worse ... position than [he]

---

**10.** Defendant also asserts that the chapter 93A claim fails because there was no contract; this argument lacks merit for reasons given in the previous section.

**11.** Dismissal of the chapter 93A claim on these grounds would be premature, in any case, because two of plaintiff's FDCPA claims will survive the motion to dismiss. "[A] violation of the FDCPA can constitute a *per se* violation of ch. 93A." *Pettway v. Harmon Law Offices, P.C.*, 2005 WL 2365331, at *6 n. 11 (D.Mass. Sep. 27, 2005); *accord Martin v. Sands*, 62 F.Supp.2d 196, 201 (D.Mass.1999).

would have been" in the absence of the offending conduct).

Accordingly, the motion to dismiss the chapter 93A claim will denied.

### D. *Fair Debt Collection Practices Act Claims*

The complaint's remaining claims arise under §§ 1692c and 1692f of the FDCPA, 15 U.S.C. §§ 1692a–1692p. There are two principal allegations: first, that defendant is liable under § 1692c for contacting plaintiff while he was represented by counsel; and second, that defendant is liable for unfair debt collection practices under § 1692f.[12]

#### 1. *Contacting Plaintiff while He was Represented by Counsel*

■■ The FDCPA, 15 U.S.C. § 1692c, provides in part that "a debt collector may not communicate with a consumer in connection with the collection of any debt . . . if the debt collector knows the consumer is represented by an attorney with respect to such debt . . ." The complaint alleges that defendant continued to contact plaintiff directly, despite having received a cease-and-desist letter requesting that all communications be directed to plaintiff's attorney. (Compl. ¶¶ 48–49). In support, the complaint includes a letter sent to plaintiff from defendant on May 24, 2010. (*Id.* Ex. D).

Defendant contends that the transmission of one letter is not enough to violate this provision of the FDCPA. The complaint, however, does not allege that only one letter was sent to plaintiff. It states that defendant "contacted him directly in connection with debt, *including but not limited to* correspondence dated May 24, 2010." (*Id.* ¶ 49) (emphasis added). At

this stage in the litigation, plaintiff is not required to attach a copy of every communication sent to him by defendant; a plausible factual allegation is sufficient.

■■ Moreover, and in any case, nothing in the statute suggests that a single letter is insufficient to violate § 1692c. "The FDCPA imposes strict liability on debt collectors for their violations [and] . . . [p]laintiff need only show a violation of one of the FDCPA's provisions to make out a prima facie case." *Harrington v. CACV of Colo., LLC,* 508 F.Supp.2d 128, 132 (D.Mass.2007). Plaintiff alleges that defendant sent him a collection-related letter after it learned he was represented by counsel; under the language of the statute, that appears to state a claim. Accordingly, defendant's motion to dismiss will be denied as to the claim under § 1693c.

### 2. *Unfair Debt Collection Practices*

Under 15 U.S.C. § 1692f, "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." The statute prohibits any conduct that falls within this broad language; in addition, it contains a specific prohibition on "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if . . . there is no present right to possession of the property claimed as collateral through an enforceable security interest." 15 U.S.C. § 1692f(6). The complaint asserts violations of both the broad and the specific provisions.

#### a. *General § 1692f Claim*

■■ Section 1692f authorizes the courts to redress "unfair or unconscionable" behavior in connection with the collection of a debt. *Sullivan v. Credit Control*

---

12. For the FDCPA to apply, two threshold criteria must be met. First, the defendant must qualify as a "debt collector." *See* 15 U.S.C. § 1692a(6). Second, the communication by the debt collector must have been made "in connection with the collection of any debt." *Id.* § 1692c(a), (b). Defendant does not deny that these criteria are met in this case.

*Servs.*, 745 F.Supp.2d 2, 12 (D.Mass.2010). This language should be "construed liberally" to effectuate the statute's purpose. *Pettway v. Harmon Law Offices, P.C.*, 2005 WL 2365331, at *3 (D. Mass. Sep. 27, 2005); *see generally* 15 U.S.C. § 1692 ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors . . .").

██  Section 1692f and chapter 93A share a general prohibition on "unfair" behavior.[13] Although violations of chapter 93A are not *per se* violations of the FDCPA, *Harrington*, 508 F.Supp.2d at 137, the Court finds that the reasons for sustaining the chapter 93A claim also provide a basis for sustaining the § 1692f claim. The motion to dismiss the § 1692f claim will therefore be denied.

### b. *§ 1692f(6) Claim*

██  Plaintiff's claim under § 1692f(6) turns on whether defendant had a "present right to possession of the property . . . through an enforceable security interest" at the time it initiated foreclosure proceedings. The complaint asserts that the TPP suspended that right. (Compl. ¶ 53). In response, defendant contends that the TPP did not bar foreclosure actions occurring after the TPP's stated expiration date.

Defendant has the better of this argument. The TPP provides that "the Lender will suspend any scheduled foreclosure sale, provided [debtor] continue[s] to meet the obligations under this Plan . . ." (*Id.* Ex. A ¶ 2(B)). However, the TPP also clearly states that the Lender must suspend foreclosure proceedings only "during the period . . . ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Pay-

ment is due . . . or (ii) termination of this Plan." (*Id.* Ex. A ¶ 2). It is undisputed that the foreclosure was commenced several months after the TPP's expiration. (*See* Pl. Opp'n Ex. A). The Court therefore finds that defendant had "a present right to possession of property . . . through an enforceable security interest" and did not violate § 1692f(6) by instituting foreclosure proceedings.

This reading is consistent with the rest of the TPP. Defendant's right to foreclose was created by the original loan documents, and the TPP clearly provides that "the Plan is not a modification of the Loan Documents." (*Id.* ¶ 2(G)). Rather, the TPP guarantees only that "[i]f [debtor] compl[ies] with the requirements in Section 2 and [his] representations continue to be true in all material respects, the Lender will send [him] a Modification Agreement for [his] signature which will modify [his] Loan Documents as necessary to reflect this new payment amount." (*Id.* ¶ 3). Thus, enforcement of the TPP would only obligate defendant to provide a Modification Agreement; it would not affect defendant's right to foreclose under the original loan.[14]

Accordingly, the motion to dismiss the § 1692f(6) claim will be granted.

### V. *Conclusion*

For the foregoing reasons, defendant's motion to dismiss is GRANTED with regard to the claim under 15 U.S.C. § 1692f(6) and otherwise DENIED.

**So Ordered.**

---

13.  As noted, a violation of the FDCPA is a *per se* violation of chapter 93A. *Pettway*, 2005 WL 2365331 at *6; *see* 209 C.M.R. § 18.17 (listing violations of 1692f as types of "unfair or deceptive" conduct under chapter 93A).

14.  Whether or not the Modification Agreement, a separate contract, would have suspended defendant's right to foreclose is not relevant to this analysis.