In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1423

LORI WIGOD,

*Plaintiff-Appellant*,

*v.*

WELLS FARGO BANK, N.A.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-02348—**Blanche M. Manning**, *Judge.*

ARGUED OCTOBER 26, 2011—DECIDED MARCH 7, 2012

Before RIPPLE and HAMILTON, *Circuit Judges*, and
MYERSCOUGH, *District Judge.*[*]

HAMILTON, *Circuit Judge.* We are asked in this appeal
to determine whether Lori Wigod has stated claims
under Illinois law against her home mortgage servicer
for refusing to modify her loan pursuant to the federal

_____

[*] The Honorable Sue E. Myerscough of the Central District
of Illinois, sitting by designation.

Home Affordable Mortgage Program (HAMP). The U.S. Department of the Treasury implemented HAMP to help homeowners avoid foreclosure amidst the sharp decline in the nation's housing market in 2008. In 2009, Wells Fargo issued Wigod a four-month "trial" loan modification, under which it agreed to permanently modify the loan if she qualified under HAMP guidelines. Wigod alleges that she did qualify and that Wells Fargo refused to grant her a permanent modification. She brought this putative class action alleging violations of Illinois law under common-law contract and tort theories and under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA). The district court dismissed the complaint in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Wigod v. Wells Fargo Bank, N.A.*, No. 10 CV 2348, 2011 WL 250501 (N.D. Ill. Jan. 25, 2011). The court reasoned that Wigod's claims were premised on Wells Fargo's obligations under HAMP, which does not confer a private federal right of action on borrowers to enforce its requirements.

This appeal followed, and it presents two sets of issues. The first set of issues concerns whether Wigod has stated viable claims under Illinois common law and the ICFA. We conclude that she has on four counts. Wigod alleges that Wells Fargo agreed to permanently modify her home loan, deliberately misled her into believing it would do so, and then refused to make good on its promise. These allegations support garden-variety claims for breach of contract or promissory estoppel. She has also plausibly alleged that Wells Fargo com-

mitted fraud under Illinois common law and engaged in unfair or deceptive business practices in violation of the ICFA. Wigod's claims for negligent hiring or super-vision and for negligent misrepresentation or conceal-ment are not viable, however. They are barred by Illinois's economic loss doctrine because she alleges only eco-nomic harms arising from a contractual relationship. Wigod's claim for fraudulent concealment is also not actionable because she cannot show that Wells Fargo owed her a fiduciary or other duty of disclosure.

The second set of issues concerns whether these state-law claims are preempted or otherwise barred by federal law. We hold that they are not. HAMP and its enabling statute do not contain a federal right of action, but neither do they preempt otherwise viable state-law claims. We accordingly reverse the judgment of the district court on the contract, promissory estoppel, fraudulent misrepresentation, and ICFA claims, and affirm its judgment on the negligence claims and fraudu-lent concealment claim.

I.  *Factual and Procedural Background*

We review *de novo* the district court's decision to dismiss Wigod's complaint for failure to state a claim. *E.g.*, *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010). We must accept as true all factual allegations in the complaint. *E.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Under the federal rules' notice pleading standard, a com-plaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2). The complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, ___ (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A party who appeals from a Rule 12(b)(6) dismissal may elaborate on her allegations so long as the elaborations are consistent with the pleading. See *Chavez v. Illinois State Police*, 251 F.3d 612, 650 (7th Cir. 2001); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439-40 (7th Cir. 1994) (reversing dismissal in relevant part based on such new elaborations); *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992) (reversing dismissal based on new elaborations).

In deciding a Rule 12(b)(6) motion, the court may also consider documents attached to the pleading without converting the motion into one for summary judgment. See Fed. R. Civ. P. 10(c). Wigod attached to her complaint her trial loan modification agreement with Wells Fargo, along with a variety of other documents produced in the course of the parties' commercial relationship. The court may also consider public documents and reports of administrative bodies that are proper subjects for judicial notice, though caution is necessary, of course. See *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986); *520 South Michigan Ave. Associates, Ltd. v. Shannon*, 549 F.3d 1119, 1137 n.14 (7th Cir. 2008); *Radaszewksi ex rel. Radaszewski v.*

*Maram*, 383 F.3d 599, 600 (7th Cir. 2004); *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998). We have done so here to provide background information on the HAMP program.

A. *The Home Affordable Mortgage Program*

In response to rapidly deteriorating financial market conditions in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act, P.L. 110-343, 122 Stat. 3765. The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures." 12 U.S.C. § 5219(a). Congress also granted the Secretary the authority to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." *Id*.

Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure. The Secretary negotiated Servicer Participation Agreements (SPAs) with dozens of home loan servicers, including Wells Fargo. Under the terms of the SPAs, servicers agreed to identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to modify the loans

of those eligible under the program. In exchange, servicers would receive a $1,000 payment for each permanent modification, along with other incentives. The SPAs stated that servicers "shall perform the loan modification . . . described in . . . the Program guidelines and procedures issued by the Treasury . . . and . . . any supplemental documentation, instructions, bulletins, letters, directives, or other communications . . . issued by the Treasury." In such supplemental guidelines, Treasury directed servicers to determine each borrower's eligibility for a modification by following what amounted to a three-step process:

First, the borrower had to meet certain threshold requirements, including that the loan originated on or before January 1, 2009; it was secured by the borrower's primary residence; the mortgage payments were more than 31 percent of the borrower's monthly income; and, for a one-unit home, the current unpaid principal balance was no greater than $729,750.

Second, the servicer calculated a modification using a "waterfall" method, applying enumerated changes in a specified order until the borrower's monthly mortgage payment ratio dropped "as close as possible to 31 percent."[1]

---

[1] The order of operations in the waterfall method is: (1) capitalize accrued interest and escrow advances to third parties; (2) reduce the annual interest rate to as low as 2 percent; (3) extend the term up to 40 years and reamortize the loan;

(continued...)

Third, the servicer applied a Net Present Value (NPV) test to assess whether the modified mortgage's value to the servicer would be greater than the return on the mortgage if unmodified. The NPV test is "essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure." *Williams v. Geithner*, No. 09-1959 ADM/JJG, 2009 WL 3757380, at *3 n.3 (D. Minn. Nov. 9, 2009). If the NPV result was negative — that is, the value of the modified mortgage would be lower than the servicer's expected return after foreclosure — the servicer was not obliged to offer a modification. If the NPV was positive, however, the Treasury directives said that "the servicer MUST offer the modification." Supplemental Directive 09-01.

B. *The Trial Period Plan*

Where a borrower qualified for a HAMP loan modification, the modification process itself consisted of two stages. After determining a borrower was eligible, the servicer implemented a Trial Period Plan (TPP) under the new loan repayment terms it formulated using the waterfall method. The trial period under the TPP lasted

---

[1] (...continued)

and (4) if necessary, forbear repayment of principal until the loan is paid off and waive interest on the deferred amount. U.S. Dep't of the Treasury, Home Affordable Modification Program Supplemental Directive 09-01 (Apr. 6, 2009) (hereinafter "Supplemental Directive 09-01").

three or more months, during which time the lender "must service the mortgage loan . . . in the same manner as it would service a loan in forbearance." Supplemental Directive 09-01. After the trial period, if the borrower complied with all terms of the TPP Agreement — including making all required payments and providing all required documentation — and if the borrower's representations remained true and correct, the servicer had to offer a permanent modification. See Supplemental Directive 09-01 ("If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period . . . .").

Treasury modified its directives on the timing of the verification process in a way that affects this case. Under the original guidelines that were in effect when Wigod applied for a modification, a servicer could initiate a TPP based on a borrower's undocumented representations about her finances. See Supplemental Directive 09-01 ("Servicers may use recent verbal [sic] financial information to prepare and offer a Trial Period Plan. Servicers are not required to verify financial information prior to the effective date of the trial period."). Those guidelines were part of a decision to roll out HAMP very quickly.[2]

---

[2] Treasury changed this policy in 2010, however, to allow servicers to offer a trial modification only after reviewing a borrower's documented financial information. The reason for the change was that loan servicers were converting trial

(continued...)

C. *Plaintiff's Loan*

In September 2007, Wigod obtained a home mortgage loan for $728,500 from Wachovia Mortgage, which later merged into Wells Fargo. (For simplicity, we refer only to Wells Fargo here.) Finding herself in financial distress, Wigod submitted a written request to Wells Fargo for a HAMP modification in April 2009. At that time, Treasury's original guidelines were still in force, so Wells Fargo could choose whether (A) to offer Wigod a trial modification based on unverified oral representations, or (B) to require her to provide documentary proof of her financial information before commencing the trial plan.

Wigod alleges that Wells Fargo took option (B). Only after Wigod provided all required financial documentation did Wells Fargo, in mid-May 2009, determine that Wigod was eligible for HAMP and send her a TPP Agreement. The TPP stated: "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the [permanent modification] Offer or will send me written notice that I do not qualify for the Offer." TPP ¶ 2.

---

[2] (...continued)

modifications to permanent ones at a rate far below Treasury's expectations. Treasury originally projected that 3 to 4 million homeowners would receive permanent modifications under HAMP. Yet one year into the program, only 170,000 borrowers had received permanent modifications — fewer than 15 percent of the 1.4 million homeowners who had been offered trial plans.

On May 28, 2009, Wigod signed two copies of the TPP
Agreement and returned them to the bank, along with
additional documents and the first of four modified
trial period payments. Wells Fargo then executed the
TPP Agreement and sent a copy to Wigod in early
June 2009. The trial term ran from July 1, 2009 to Novem-
ber 1, 2009. The TPP Agreement provided: "If I am in
compliance with this Loan Trial Period and my repre-
sentations in Section 1 continue to be true in all material
respects, then the Lender will provide me with a [perma-
nent] Loan Modification Agreement." TPP ¶ 1.

Wigod timely made, and Wells Fargo accepted, all four
payments due under the trial plan. On the pleadings, we
must assume that she complied with all other obliga-
tions under the TPP Agreement. Nevertheless, Wells
Fargo declined to offer Wigod a permanent HAMP modifi-
cation, informing her only that it was "unable to get you
to a modified payment amount that you could afford per
the investor guidelines on your mortgage." After the
expiration of the TPP, Wells Fargo warned Wigod that
she owed the outstanding balance and late fees and, in a
subsequent letter, that she was in default on her home
mortgage loan. Over the next few months, Wigod pro-
tested Wells Fargo's decision in a number of telephone
conversations, but to no avail. During that time, she
continued to make mortgage payments in the reduced
amount due under the TPP, even after the trial term
ended on November 1, 2009. In the meantime, Wells
Fargo sent Wigod monthly notices threatening to fore-
close if she failed to pay the accumulating amount of
delinquency based on the original loan terms.

According to Wigod, Wells Fargo improperly
re-evaluated her for HAMP after it had already deter-
mined that she was qualified and offered her a trial
modification, and that it erroneously determined that
she was ineligible for a permanent modification by mis-
calculating her property taxes. Wells Fargo responds
that Treasury guidelines then in force allowed the
servicer to verify, after initiating a trial modification,
that the borrower satisfied all government and investor
criteria for a permanent modification, and that Wigod
did not. In the course of this proceeding, however,
Wells Fargo has not identified the specific criteria that
Wigod failed to satisfy, except to say that it could not
craft a permanent modification plan for her that would
be consistent with its investor guidelines. Because we
are reviewing a Rule 12(b)(6) dismissal, we disregard
Wells Fargo's effort to contradict the complaint.[3]

D. *Procedural History*

On April 15, 2010, Wigod filed a class action complaint
in the Northern District of Illinois on behalf of all home-
owners in the United States who had entered into TPP
Agreements with Wells Fargo, complied with all terms,

---

[3] Wells Fargo also asserted for the first time in oral argument
that Wigod had never actually been qualified for loan modifica-
tion. The assertion must be disregarded because it presents
a factual question that cannot be resolved in deciding a
Rule 12(b)(6) motion. *E.g.*, *Morrison v. YTB Int'l, Inc.*, 649 F.3d
533, 538 (7th Cir. 2011).

and were nevertheless denied permanent modifications. Wigod's complaint contains seven counts: (I) breach of contract (and breach of implied covenants) for violating the TPP; (II) promissory estoppel, also based on representations made in the TPP; (III) breach of the Servicer Participation Agreement; (IV) negligent hiring and supervision; (V) fraudulent misrepresentation or concealment; (VI) negligent misrepresentation or concealment; and (VII) violation of the ICFA.

The district court dismissed Counts I, II, IV, and VI because each theory of liability was "premised on Wells Fargo's obligations" under HAMP, which does not provide borrowers a private federal right of action against servicers to enforce it. In the district court's view, Wigod's common-law claims for breach of contract, promissory estoppel, negligent hiring and supervision, and fraud were "not sufficiently independent to state . . . separate state law cause[s] of action." The district court dismissed Count III because a borrower lacks standing to sue as an intended third-party beneficiary of the Servicer Participation Agreement. Count VI was dismissed because the district court concluded that Wigod could not reasonably have relied on Wells Fargo's representation in the TPP that she would receive a permanent modification so long as she made all four trial payments and her financial information remained true and accurate, since elsewhere the TPP required Wigod to meet all of HAMP's requirements for permanent modification. Finally, the district court dismissed Count VII because Wigod had not plausibly alleged that Wells Fargo acted with intent to deceive her, which the court

concluded was a required element under the ICFA. Wigod appeals the district court's decision as to all claims but Count III.

We first examine whether Wigod has adequately pled viable claims under Illinois law, and we conclude that she has done so for breach of contract, promissory estoppel, fraudulent misrepresentation, and violation of the ICFA. We then consider whether federal law precludes Wigod from pursuing her state-law claims, and we hold that it does not.[4]

---

[4] We have identified more than 80 other federal cases in which mortgagors brought HAMP-related claims. The legal theories relied on by these plaintiffs fit into three groups. First, some homeowners tried to assert rights arising under HAMP itself. Courts have uniformly rejected these claims because HAMP does not create a private federal right of action for borrowers against servicers. See, *e.g.*, *Simon v. Bank of Am., N.A.*, No. 10-cv-00300-GMN-LRL, 2010 WL 2609436, at *10 (D. Nev. June 23, 2010) (dismissing claim because HAMP "does not provide borrowers with a private cause of action against lenders for failing to consider their application for loan modification, or even to modify an eligible loan").

In the second group, plaintiffs claimed to be third-party beneficiaries of their loan servicers' SPAs with the United States. Most but not all courts dismissed these challenges as well, holding that borrowers were not intended third-party beneficiaries of the SPAs. Compare *Villa v. Wells Fargo Bank, N.A.*, No. 10CV81 DMS (WVG), 2010 WL 935680, at *2-3 (S.D. Cal. Mar. 15, 2010) (granting motion to dismiss claims of plaintiff pursuing third-party beneficiary theory), and *Escobedo v.*

(continued...)

---

[4] (...continued)

*Countrywide Home Loans, Inc.*, No. 09 cv1557 BTM (BLM), 2009 WL 4981618, at *2-3 (S.D. Cal. Dec. 15, 2009) (same), with *Sampson v. Wells Fargo Home Mortg., Inc.*, No. CV 10-08836 DDP (SSx), 2010 WL 5397236, at *3 (C.D. Cal. Nov. 19, 2010) ("Here, the court is persuaded that Plaintiff — an individual facing foreclosure of her home — has made a substantial showing that she is an intended beneficiary of the HAMP, a federal agreement entered into by Defendants."). The courts denying motions to dismiss may have been led astray by *County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237 (9th Cir. 2009), which was reversed by the Supreme Court. See *Astra USA, Inc. v. Santa Clara County*, 131 S. Ct. 1342 (2011). In *Astra*, the Supreme Court held that health care facilities covered by § 340B of the Public Health Services Act could not sue as third-party beneficiaries of drug price-ceiling contracts between pharmaceutical manufacturers and the government because Congress did not create a private right of action under the Act. *Id*. at 1345. Here, too, Congress did not create a private right of action to enforce the HAMP guidelines, and since *Astra*, district courts have correctly applied the Court's decision to foreclose claims by homeowners seeking HAMP modifications as third-party beneficiaries of SPAs. See, *e.g*, *Boyd v. U.S. Bank, N.A. ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*, 787 F. Supp. 2d 747, 757 (N.D. Ill. 2011).

Wigod is in the third group, basing claims directly on the TPP Agreements themselves. These plaintiffs avoid *Astra* because they claim rights not as third-party beneficiaries but as parties in direct privity with their lenders or loan servicers. In these third-generation cases, district courts have split. Including first- and second-generation cases, about 50 of the

(continued...)

II. *State-Law Claims*

   A. *Breach of Contract*

At the heart of Wigod's complaint is her claim for breach of contract. The required elements of a breach of contract claim in Illinois are the standard ones of common law: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Associa-*

---

[4] (...continued)

courts granted motions to dismiss in full. See, *e.g.*, *Nadan v. Homesales, Inc.*, No. CV F 11-1181 LJO SKO, 2011 WL 3584213 (E.D. Cal. Aug. 12, 2011); *Vida v. OneWest Bank, F.S.B.*, No. 10-987-AC, 2010 WL 5148473 (D. Or. Dec. 13, 2010). In 30 or so cases, courts denied the motions in full or in part, allowing claims based on contract, tort, and/or state consumer fraud statutes to go forward. See, *e.g.*, *Allen v. CitiMortgage, Inc.*, No. CCB-10-2740, 2011 WL 3425665 (D. Md. Aug. 4, 2011); *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342 (D. Mass. 2011). For particularly instructive discussions of some of the issues involved in these cases, compare *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, No. 10-md-02193-RWZ, 2011 WL 2637222, at *3-6 (D. Mass. July 6, 2011) (multi-district litigation) (denying defendant's motion to dismiss claims for breach of contract and violation of state consumer protection statutes), with *Bourdelai v. J.P. Morgan Chase*, No. 3:10CV670-HEH, 2011 WL 1306311, at *3-6 (E.D. Va. Apr. 1, 2011) (dismissing claims for breach of contract). See generally John R. Chiles & Matthew T. Mitchell, *Hamp: An Overview of the Program and Recent Litigation Trends*, 65 Consumer Fin. L. Q. Rep. 194, 195 (2011) (examining the "current litigation trends in this recent spate of HAMP-related lawsuits").

*tion Benefit Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007), quoting *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. 2006).

In two different provisions of the TPP Agreement, paragraph 1 and section 3, Wells Fargo promised to offer Wigod a permanent loan modification if two conditions were satisfied: (1) she complied with the terms of the TPP by making timely payments and disclosures; and (2) her representations remained true and accurate.[5] Wigod alleges that she met both conditions and accepted the offer, but that Wells Fargo refused to provide a permanent modification. These allegations state a claim for breach of contract. Wells Fargo offers three theories, however, to argue that the TPP was not an enforceable contract: (1) the TPP contained no valid offer; (2) consider-

---

[5] Paragraph 1 provided:

> If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

Section 3 stated:

> If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

ation was absent; and (3) the TPP lacked clear and definite terms. We reject each theory.

1. *Valid Offer*

In Illinois, the "test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender." *Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002), quoting *McCarty v. Verson Allsteel Press Co.*, 411 N.E.2d 936, 943 (Ill. App. 1980); see also Restatement (Second) of Contracts § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."). To determine whether the TPP made a definite (though conditional) offer of permanent modification, we examine the language of the agreement itself and the surrounding circumstances. See Restatement (Second) of Contracts § 26, cmts. *a* & *c* (1981), citing *R.E. Crummer & Co. v. Nuveen*, 147 F.2d 3, 5 (7th Cir. 1945).

Wells Fargo contends that the TPP was not an enforceable offer to permanently modify Wigod's mortgage because it was conditioned on Wells Fargo's further review of her financial information to ensure she qualified under HAMP. Under contract law principles, when "some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is as yet no operative offer." 1 Joseph M. Perillo, *Corbin on Contracts* § 1.11, at 31 (rev. ed. 1993) (hereinafter "*Corbin on Contracts* (rev. ed.)"), citing

*Bank of Benton v. Cogdill*, 454 N.E.2d 1120, 1125-26 (Ill. App. 1983). Thus, "a person can prevent his submission from being treated as an offer by [using] suitable language conditioning the formation of a contract on some further step, such as approval by corporate head-quarters." *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1230 (7th Cir. 1995) (Illinois law). Wells Fargo contends that the TPP did just that by making a permanent modification expressly contingent on the bank taking some later action.

That is not a reasonable reading of the TPP. Certainly, when the promisor conditions a promise on *his own* future action or approval, there is no binding offer. But when the promise is conditioned on the performance of some act *by the promisee* or a third party, there can be a valid offer. See 1 Richard A. Lord, *Williston on Contracts* § 4:27 (4th ed. 2011) (hereinafter "*Williston on Contracts*") ("[A] condition of subsequent approval by the promisor in the promisor's sole discretion gives rise to no obligation. . . . However, the mere fact that an offer or agreement is subject to events not within the promisor's control . . . will not render the agreement illusory."); compare *McCarty*, 411 N.E.2d at 942 ("An offer is an act on the part of one person giving another person the legal power of creating the obligation called a contract."), with *Village of South Elgin v. Waste Management of Illinois, Inc.*, 810 N.E.2d 658, 672 (Ill. App. 2004) ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further mani-

festation of assent."), quoting Restatement (Second) of Contracts § 26 (1981).

Here the TPP spelled out two conditions precedent to Wells Fargo's obligation to offer a permanent modification: Wigod had to comply with the requirements of the trial plan, and her financial information had to remain true and accurate. But these were conditions to be satisfied by the promisee (Wigod) rather than conditions requiring further manifestation of assent by the promisor (Wells Fargo). These conditions were therefore consistent with treating the TPP as an offer for permanent modification.

Wells Fargo insists that its obligation to modify Wigod's mortgage was also contingent on its determination, after the trial period began, that she qualified under HAMP guidelines. That theory conflicts with the plain terms of the TPP. At the beginning, when Wigod received the unsigned TPP, she had to furnish Wells Fargo with "documents to permit verification of . . . [her] income . . . to determine whether [she] qualif[ied] for the offer." TPP ¶ 2. The TPP then provided: "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan *if I qualify for the Offer* or will send me written notice that I do not qualify for the offer." TPP ¶ 2 (emphasis added). Wigod signed two copies of the Plan on May 29, 2009, and returned them along with additional financial documentation to Wells Fargo.

Under the terms of the TPP Agreement, then, that moment was Wells Fargo's opportunity to determine

whether Wigod qualified. If she did not, it could have and should have denied her a modification on that basis. Instead, Wells Fargo countersigned on June 4, 2009 and mailed a copy to Wigod with a letter congratulating her on her approval for a trial modification. In so doing, Wells Fargo communicated to Wigod that she qualified for HAMP and would receive a permanent "Loan Modification Agreement" after the trial period, provided she was "in compliance with this Loan Trial Period and [her] representations . . . continue[d] to be true in all material respects." TPP ¶ 1.

In more abstract terms, then, when Wells Fargo executed the TPP, its terms included a unilateral offer to modify Wigod's loan conditioned on her compliance with the stated terms of the bargain. "The test for an offer is whether it induces a reasonable belief in the [offeree] that he can, by accepting, bind the [offeror]." *Architectural Metal Systems*, 58 F.3d at 1229, citing *McCarty*, 411 N.E.2d at 943; see also 1 *Williston on Contracts* § 4.10 (offer existed if the purported offeree "reasonably [could] have supposed that by acting in accordance with it a contract could be concluded"). Here a reasonable person in Wigod's position would read the TPP as a definite offer to provide a permanent modification that she could accept so long as she satisfied the conditions.

This is so notwithstanding the qualifying language in section 2 of the TPP. An acknowledgment in that section provided: "I understand that the Plan is not a modification of the Loan Documents and that the Loan

Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has passed." TPP § 2.G.[6] According to Wells Fargo, this provision meant that all of its obligations to Wigod terminated if Wells Fargo itself chose not to deliver "a fully executed TPP *and* 'Modification Agreement' by November 1, 2009." In other words, Wells Fargo argues that its obligation to send Wigod a permanent Modification Agreement was triggered only if and when it actually sent Wigod a Modification Agreement.

Wells Fargo's proposed reading of section 2 would nullify other express provisions of the TPP Agreement. Specifically, it would nullify Wells Fargo's obligation to "send [Wigod] a Modification Agreement" if she "compl[ied] with the requirements" of the TPP and if her "representations . . . continue to be true in all material respects." TPP § 3. Under Wells Fargo's theory, it could simply refuse to send the Modification Agreement for any reason whatsoever — interest rates went up, the

---

[6] The immediately preceding paragraph of the TPP contains a substantially similar acknowledgment: "If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and the Plan will terminate." TPP § 2.F.

economy soured, it just didn't like Wigod — and there would still be no breach. Under this reading, a borrower who did all the TPP required of her would be entitled to a permanent modification only when the bank exercised its unbridled discretion to put a Modification Agreement in the mail. In short, Wells Fargo's interpretation of the qualifying language in section 2 turns an otherwise straightforward offer into an illusion.

The more natural interpretation is to read the provision as saying that no permanent modification *existed* "unless and until" Wigod (i) met all conditions, (ii) Wells Fargo executed the Modification Agreement, and (iii) the effective modification date passed. Before these conditions were met, the loan documents remained unmodified and in force, but under paragraph 1 and section 3 of the TPP, Wells Fargo still had an obligation to *offer* Wigod a permanent modification once she satisfied all her obligations under the agreement. This interpretation follows from the plain and ordinary meaning of the contract language stating that "the Plan is not a modification . . . unless and until" the conditions precedent were fulfilled. TPP § 2.G. And, unlike Wells Fargo's reading, it gives full effect to all of the TPP's provisions. See *McHenry Savings Bank v. Autoworks of Wauconda, Inc.*, 924 N.E.2d 1197, 1205 (Ill. App. 2010) ("If possible we must interpret a contract in a manner that gives effect to all of the contract's provisions."), citing *Bank of America Nat'l Trust & Savings Ass'n v. Schulson*, 714 N.E.2d 20, 24 (Ill. App. 1999). Once Wells Fargo signed the TPP Agreement and returned it to Wigod, an objectively reasonable person would construe it as an offer

to provide a permanent modification agreement if she fulfilled its conditions.

### 2. *Consideration*

Under Illinois law, "consideration consists of some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them." *Dumas v. Infinity Broadcasting Corp.*, 416 F.3d 671, 679 n.9 (7th Cir. 2005), quoting *Doyle v. Holy Cross Hospital*, 708 N.E.2d 1140, 1145 (Ill. 1999). "If a debtor does something more or different in character from that which it was legally bound to do, it will constitute consideration for the promise." 3 *Williston on Contracts*, § 7:27.

Here the TPP contained sufficient consideration because, under its terms, Wigod (the promisee) incurred cognizable legal detriments. By signing it, Wigod agreed to open new escrow accounts, to undergo credit counseling (if asked), and to provide and vouch for the truth of her financial information. Wigod's complaint alleges that she did more than simply agree to pay a discounted amount in satisfaction of a prior debt. In exchange for Wells Fargo's conditional promise to modify her home mortgage, she undertook multiple obligations above and beyond her existing legal duty to make mortgage payments. This was adequate consideration, as a number of district courts adjudicating third-generation HAMP cases have recognized. See, *e.g.*, *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, No. 10-md-02193-RWZ, 2011 WL 2637222, at *4 (D. Mass. July 6, 2011) (multi-district litigation) ("The requirements

of the TPP all constitute new legal detriments."); *Ansanelli v. JP Morgan Chase Bank, N.A.*, No. C 10-03892 WHA, 2011 WL 1134451, at *4 (N.D. Cal. Mar. 28, 2011) (same).

### 3. *Definite and Certain Terms*

A contract is enforceable under Illinois law if from its plain terms it is ascertainable what each party has agreed to do. *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991). "A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Id*. at 984. Wells Fargo contends that the TPP is unenforceable because it did not specify the exact terms of the permanent loan modification, including the interest rate, the principal balance, loan duration, and the total monthly payment.[7] Because the TPP allowed the lender to determine the precise contours of the permanent modification at a later date, Wells Fargo argues,

---

[7] The TPP stated that its monthly payment schedule "is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3 below." TPP § 2. Section 3 provided: "I understand that once Lender is able to determine the final amounts of unpaid interest and any other delinquent amounts . . . and after deducting . . . any remaining money held at the end of the Trial Period . . . the Lender will determine the new payment amount." TPP § 3.

it reflected no "meeting of the minds" as to the permanent modification's essential terms, so that it was an unenforceable "agreement to agree."

It is true that Wigod's trial period terms were an "estimate" of the terms of the permanent modification and that Wells Fargo had some limited discretion to modify permanent terms based on its determination of the "final amounts of unpaid interest and other delinquent amounts." TPP §§ 2, 3. But this hardly makes the TPP a mere "agreement to agree." This court, applying Illinois law, has explained that a contract with open terms can be enforced:

> In order for such a contract to be enforceable, however, it is necessary that the terms to be agreed upon in the future can be determined "independent of a party's mere 'wish, will, and desire' . . ., either by virtue of the agreement itself or by commercial practice or other usage or custom."

*United States v. Orr Construction Co.*, 560 F.2d 765, 769 (7th Cir. 1977), quoting 1 Arthur Linton Corbin, *Corbin on Contracts* § 95, at 402 (1960 ed.) (hereinafter "*Corbin on Contracts* (1960 ed.)") (internal quotation marks omitted). Professor Corbin's treatise continues: "This may be the case, even though the determination is left to one of the contracting parties, if he is required to make it 'in good faith' in accordance with some existing standard or with facts capable of objective proof." 1 *Corbin on Contracts* § 95, at 402 (1960 ed.).

In this case, HAMP guidelines provided precisely this "existing standard" by which the ultimate terms of

Wigod's permanent modification were to be set. When one party to a contract has discretion to set open terms in a contract, that party must do so "reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties*." Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003) (applying Illinois law). In its program directives, the Department of the Treasury set forth the exact mechanisms for determining borrower eligibility and for calculating modification terms — namely, the waterfall method and the NPV test. These HAMP guidelines unquestionably informed the reasonable expectations of the parties to Wigod's TPP Agreement, which is actually entitled "*Home Affordable Modification Program* Loan Trial Period." In Wigod's reasonable reading of the agreement, if she "qualif[ied] for the Offer" (meaning, of course, that she qualified under HAMP) and complied with the terms of the TPP, Wells Fargo would offer her a permanent modification. TPP ¶ 2. To calculate Wigod's trial modification terms, Wells Fargo was obligated to use the NPV test and the waterfall method to try to bring her monthly payments down to 31 percent of her gross income. Although the trial terms were just an "estimate" of the permanent modification terms, the TPP fairly implied that any deviation from them in the permanent offer would also be based on Wells Fargo's application of the established HAMP criteria and formulas.

Wells Fargo, of course, has not offered Wigod *any* permanent modification, let alone one that is consistent with HAMP program guidelines. Thus, even without

reference to the HAMP modification rules, Wigod's complaint alleges that Wells Fargo breached its promise to provide her with a permanent modification once she fulfilled the TPP's conditions. Although Wells Fargo may have had some limited discretion to set the precise terms of an offered permanent modification, it was certainly required to offer *some* sort of good-faith permanent modification to Wigod consistent with HAMP guidelines. It has offered none. See *Corbin on Contracts* § 4.1, at 532 (rev. ed.) ("Where the parties intend to contract but defer agreement on certain essential terms until later, the gap can be cured if one of the parties offers to accept any reasonable proposal that the other may make. The other's failure to make any proposal is a clear indication that the missing term is not the cause of the contract failure."). We must assume at the pleadings stage that Wigod met each of the TPP's conditions, and it is undisputed that Wells Fargo offered no permanent modification at all. The terms of the TPP are clear and definite enough to support Wigod's breach of contract theory. Accord, *e.g.*, *Belyea v. Litton Loan Servicing, LLP*, No. 10-10931-DJC, 2011 WL 2884964, at *8 (D. Mass. July 15, 2011) ("At a minimum, then, the TPP contains all essential and material terms necessary to govern the trial period repayments and the parties' related obligations."), quoting *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 352 (D. Mass. 2011). Wigod's complaint sufficiently pled each element of a breach of contract claim under Illinois law. The relevant documents do not undermine her claim as a matter of law.

B.  *Promissory Estoppel*

Wigod also asserts a claim for promissory estoppel, which is an alternative means of obtaining contractual relief under Illinois law. See *Prentice v. UDC Advisory Services, Inc.*, 648 N.E.2d 146, 150 (Ill. App. 1995), citing *Quake Construction, Inc. v. American Airlines, Inc.*, 565 N.E.2d 990 (Ill. 1990). Promissory estoppel makes a promise binding where "all the other elements of a contract exist, but consideration is lacking." *Dumas v. Infinity Broadcasting Corp.*, 416 F.3d 671, 677 (7th Cir. 2005), citing *Bank of Marion v. Robert "Chick" Fritz, Inc.*, 311 N.E.2d 138 (Ill. 1974). The doctrine is "commonly explained as promoting the same purposes as the tort of misrepresentation: punishing or deterring those who mislead others to their detriment and compensating those who are misled." Avery Katz, *When Should an Offer Stick? The Economics of Promissory Estoppel in Preliminary Negotiations*, 105 Yale L.J. 1249, 1254 (1996). To establish the elements of promissory estoppel, "the plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523-24 (Ill. 2009).

Wigod has adequately alleged her claim of promissory estoppel. She asserts that Wells Fargo made an unambiguous promise that if she made timely payments and accurate representations during the trial period, she would receive an offer for a permanent loan modifica-

tion calculated using the required HAMP methodology. She also alleges that she relied on that promise to her detriment by foregoing the opportunity to use other remedies to save her home (such as restructuring her debt in bankruptcy), and by devoting her resources to making the lower monthly payments under the TPP Agreement rather than attempting to sell her home or simply defaulting. A lost opportunity can constitute a sufficient detriment to support a promissory estoppel claim. See *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 428 (7th Cir. 1991) (noting that a "foregone . . . opportunity" would be "reliance enough to support a claim of promissory estoppel") (applying Indiana law). Wigod's complaint therefore alleged a sufficiently clear promise, evidence of her own reliance, and an explanation of the injury that resulted. She also contends that Wells Fargo ought to have anticipated her compliance with the terms of its promise. This was enough to present a facially plausible claim of promissory estoppel.[8]

---

[8] Because Wigod has successfully pled a breach of contract claim, including consideration, at this stage of the litigation there is "no gap in the remedial system for promissory estoppel to fill." *Dumas*, 416 F.3d at 677, quoting *All-Tech Telecom Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999). One or more of Wells Fargo's contract defenses may remain in dispute for the remainder of the litigation. For this reason, Wigod may preserve her promissory estoppel claim as an alternative in the event the district court or a jury later concludes as a factual matter that an enforceable contract did not exist.

C. *Negligent Hiring and Supervision*

Wigod's next claim is that Wells Fargo deliberately hired unqualified customer service employees and refused to train them to implement HAMP effectively "so that borrowers would become too frustrated to pursue their modifications." Compl. ¶ 96. Wigod also alleges that Wells Fargo adopted policies designed to sabotage the HAMP modification process, such as a rule limiting borrowers to only one telephone call with any given employee, effectively requiring borrowers to start from scratch with an unfamiliar agent in any follow-up call.[9]

The economic loss doctrine forecloses Wigod's recovery on this negligence claim. Known as the *Moorman* doctrine in Illinois, this doctrine bars recovery in tort for purely economic losses arising out of a failure to perform contractual obligations. See *Moorman Manufacturing Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 448-49 (Ill. 1982). The *Moorman* doctrine precludes liability for negligent hiring and supervision in cases where, in the course of performing a contract between the defendant and the

---

[9] The Treasury directives require servicers to have "adequate staffing, resources, and facilities for receiving and processing HAMP documents" and to "ensure that . . . inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution." Supplemental Directive 09-01. Additionally, in the Servicer Participation Agreement it executed with the government, Wells Fargo agreed to "use qualified individuals with suitable training, education, experience and skills to perform the services."

plaintiff, the defendant's employees negligently cause the plaintiff to suffer some purely economic form of harm. See, *e.g.*, *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 1002 (N.D. Ill. 2010) (plaintiff's "negligent retention and supervision claims violate *Moorman* because they relate to [its] contractual and commercial relationship" with defendant); *Soranno v. New York Life Ins. Co.*, No. 96 C 7882, 1999 WL 104403, at *16 (N.D. Ill. Feb. 24, 1999) (Plaintiffs' negligent supervision claims "cannot survive *Moorman* to the extent that they relate to . . . [the] actions [of the defendant's agent] in selling the insurance contracts and annuities [to plaintiffs]. Those acts — and the related duty to supervise them — appear to have arisen under the contract."); *Johnson Products Co. v. Guardsmark, Inc.*, No. 97 C 6406, 1998 WL 102687, at *8 (N.D. Ill. Feb. 27, 1998) (economic loss doctrine barred negligent hiring and supervision claims against security firm whose guards stole from the plaintiff because no Illinois case law imposed "specific duties upon providers of security services to employ honest personnel and to use reasonable care to supervise them").

There are a number of exceptions to the *Moorman* doctrine, each rooted in the general rule that "[w]here a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 514 (Ill. 1994). To determine whether the *Moorman* doctrine bars tort claims, the key question is whether the defendant's duty arose by operation of

contract or existed independent of the contract. See
*Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th
Cir. 2011) ("These exceptions [to the economic loss doc-
trine] have in common the existence of an extra-contractual
duty between the parties, giving rise to a cause of action
in tort separate from one based on the contract itself.");
*2314 Lincoln Park West Condominium Ass'n v. Mann, Gin,
Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 351 (Ill. 1990) ("the
concept of duty is at the heart of distinction drawn by
the economic loss rule"). If, for example, an architect
bungles a construction design, the *Moorman* doctrine
bars the aggrieved owner's suit for negligence. See *id.*
The shoddy workmanship is a breach of the design con-
tract rather than a failure to observe some independent
duty of care owed to the world at large.

To the extent Wells Fargo had a duty to service
Wigod's home loan responsibly and with competent
personnel, that duty emerged solely out of its contractual
obligations. As we recently noted, a mortgage contract
itself "cannot give rise to an extra-contractual duty
without some showing of a fiduciary relationship be-
tween the parties," and no such relationship existed here.
*Catalan*, 629 F.3d at 693 (applying *Moorman* doctrine).
Although Wigod has a legally viable claim that the
TPP Agreement bound Wells Fargo to offer her a perma-
nent modification, Wells Fargo owed her no independent
duty to employ qualified people and to supervise
them appropriately in servicing her home loan. Cf. *Johnson
Products Co.*, 1998 WL 102687, at *9 ("The manufacturer
of a defective product that simply does not work
properly does not owe a duty in tort to the purchaser of

the product to use reasonable care in producing the product. Rather, the purchaser's remedy lies in breach of contract or breach of warranty. . . . [Defendant] had no obligation to use reasonable care in performing its duties, for its only obligations arose under the contract itself."). Wigod's rights here are contractual in nature. If Wells Fargo failed to honor their agreement — whether by hiring incompetents or simply through bald refusals to perform — contract law provides her remedies.

Wigod argues that the *Moorman* doctrine does not bar her negligent hiring and supervision claims because she seeks equitable relief and therefore her asserted harm goes beyond pure economic injury. But this theory assumes that there is some necessary connection between the nature of the loss alleged and the appropriate form of relief. This is not so. Purely economic losses may sometimes be best remedied through injunctive relief — when, for instance, specific performance of a contract is required to make the plaintiff whole, or when the risk of under-compensation is very high. See Anthony T. Kronman, *Specific Performance*, 45 U. Chi. L. Rev. 351, 362 (1978) (theorizing that specific performance is awarded where a court "cannot obtain, at reasonable cost, enough information about substitutes to permit it to calculate an award of money damages without imposing an unacceptably high risk of undercompensation on the injured promisee"). Conversely, it is routine for tort plaintiffs who have incurred non-economic losses (such as physical injury) to seek and receive monetary damages. Wigod has suffered no injury to person

or property. The harm she alleges is that Wells Fargo did not restructure the terms of her mortgage and thereby caused her to default. This is a purely economic injury if ever we saw one. Wigod's claim for negligent hiring and supervision was properly dismissed.

D. *Fraud Claims*

Illinois courts expressly recognize an exception to the *Moorman* doctrine "where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud." *Catalan*, 629 F.3d at 693, quoting *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 843 N.E.2d 327, 333 (Ill. 2006); see also *Stein v. D'Amico*, No. 86 C 9099, 1987 WL 4934, at *3 (N.D. Ill. June 5, 1987) (applying fraud exception to *Moorman* doctrine for claim of fraudulent concealment). Because of this exception, the economic loss doctrine does not bar Wigod's claim for fraudulent misrepresentation. She has adequately pled the elements of fraudulent misrepresentation but not fraudulent concealment.

1. *Fraudulent Misrepresentation*

The elements of a claim of fraudulent misrepresentation in Illinois are:

> (1) [a] false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and

(5) damage to the other party resulting from that reliance.

*Dloogatch v. Brincat*, 920 N.E.2d 1161, 1166 (Ill. App. 2009), quoting *Soules v. General Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980). Under the heightened federal pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff "alleging fraud . . . must state with particularity the circumstances constituting fraud." See *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) ("This heightened pleading requirement is a response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do.") (internal quotation marks omitted). We have summarized the particularity requirement as calling for the first paragraph of any newspaper story: "the who, what, when, where, and how." *E.g.*, *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008). Wigod's complaint satisfies that standard. She identifies the knowing misrepresentation as Wells Fargo's statement in the TPP that it would offer her a permanent modification if she complied with the terms and conditions of the TPP. She also alleges that Wells Fargo intended that she would act in reliance on promises it made in the TPP and that she reasonably did so to her detriment. Fraudulent intent may be alleged generally, see Fed. R. Civ. P. 9(b), so the only element seriously at issue on the pleadings is reasonable reliance.

The district court held that "Wigod could not reasonably have relied on" the TPP's promise of a

permanent modification because this "would have re-quired her to ignore the remainder of the contract which required her to meet *all* of HAMP's requirements." We disagree. Under Illinois law, justifiable reliance exists when it was "reasonable for plaintiff to accept de-fendant's statements without an independent inquiry or investigation." *InQuote Corp. v. Cole*, No. 99-cv-6232, 2000 WL 1222211, at *3 (N.D. Ill. Aug. 24, 2000); see *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 371 (7th Cir. 1988) ("the crucial question is whether the plaintiff's conduct was so unreasonable under the circumstances and 'in light of the information open to him, that the law may properly say that this loss is his own responsibility'"), quoting *Chicago Title & Trust Co. v. First Arlington Nat'l Bank*, 454 N.E.2d 723, 729 (Ill. App. 1983). As explained above, the TPP as a whole supports Wigod's reading of it to require Wells Fargo to offer her a permanent modification once it determined she was qualified and sent her an executed copy, and she satisfied the conditions precedent. Based on the pleadings, we cannot say that her alleged reliance on Wells Fargo's promise was objectively unreasonable.

Wigod's fraudulent misrepresentation claim at first seems vulnerable on other grounds, however, since it represents a claim of promissory fraud — that is, a "false statement of intent regarding future conduct," as opposed to a false statement of existing or past fact. *Association Benefit Services, Inc.*, 493 F.3d at 853. Promissory fraud is "generally not actionable" in Illinois "unless the plaintiff also proves that the act was a part of a scheme to defraud." *Id.*, citing *Bradley Real Estate Trust v. Dolan*

*Associates, Ltd.*, 640 N.E.2d 9, 12-13 (Ill. App. 1994). But this "scheme exception" is broad — so broad it "tends to engulf and devour" the rule. *Stamatakis Industries, Inc. v. King*, 520 N.E.2d 770, 772 (Ill. App. 1987). To invoke the scheme exception, the plaintiff must allege and then prove that, at the time the promise was made, the defendant did not intend to fulfill it. *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992) ("In order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent — a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling him to relief."), quoting *Hollymatic Corp. v. Holly Systems, Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985). Such evidence would include a "a pattern of fraudulent statements, or one particularly egregious fraudulent statement." *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136 (7th Cir. 2011) (internal citations omitted).

Wigod alleges that she was a victim of a scheme to defraud: in her complaint, she accuses Wells Fargo of deliberately implementing a "system designed to wrongfully deprive its eligible HAMP borrowers of an opportunity to modify their mortgages." Compl. ¶ 8. Whether she has alleged "specific, objective manifestations" of this scheme is a closer question, but we think it likely that Illinois courts would say yes.

The scheme alleged here does not rest solely on Wells Fargo's single broken promise to Wigod. She claims that thousands of HAMP-eligible homeowners became victims of Wells Fargo's "intentional and systematic

failure to offer permanent loan modifications" after falsely telling them it would. Compl. ¶ 1. Illinois courts have found as few as two broken promises enough to establish a scheme to defraud. See, *e.g.*, *General Electric Credit Auto Lease, Inc. v. Jankuski*, 532 N.E.2d 361, 381-83 (Ill. App. 1988) (finding that plaintiffs pled fraudulent scheme by alleging that auto dealership falsely promised that (1) the "holding agreement" executed with plaintiffs would be cancelled once their son signed a lease for the vehicle; and (2) the son could cancel his lease if he was later transferred overseas); *Stamatakis Industries*, 520 N.E.2d at 772-74 (holding that plaintiff properly pled a scheme to defraud by alleging that defendant broke his promises to (1) make good on a contract for the purchase of equipment; and (2) enter into an employment contract for five years with a covenant not to compete). But see *Doherty v. Kahn*, 682 N.E.2d 163 (Ill. App. 1997) (holding that plaintiff did not plead scheme to defraud by alleging that defendant's broken promises that (1) plaintiff would be president of company, (2) own 65 percent of the stock, and (3) earn a specified monthly salary). In another case, the Illinois Supreme Court found that a single false promise made to the public at large satisfied the scheme exception to the general rule against promissory fraud. See *Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 641 (Ill. 1977) (finding a scheme to defraud alleged against a medical school that promised in its catalog to evaluate and admit applicants based on merit when in fact the school intended to make decisions based on monetary contributions). Wigod alleges that Wells Fargo made

and broke promises of permanent modifications to her and to thousands of other potential class members as well. If true, such a widespread pattern of deception could reasonably be considered a scheme under Illinois law and thus actionable as promissory fraud. See *HPI Health Care Services v. Mount Vernon Hospital, Inc.*, 545 N.E.2d 672, 682 (Ill. 1989); *Steinberg*, 371 N.E.2d at 641.

### 2. *Fraudulent Concealment*

The heightened pleading standard of Rule 9(b) also applies to fraudulent concealment claims. To plead this tort properly, in addition to meeting the elements of fraudulent misrepresentation, a plaintiff must allege that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose to the plaintiff. *Weidner v. Karlin*, 932 N.E.2d 602, 605 (Ill. App. 2010). A duty to disclose would arise if "plaintiff and defendant are in a fiduciary or confidential relationship" or in a "situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996).

Wigod alleges that Wells Fargo knowingly concealed that it would (1) report her to credit rating agencies as being in default on her mortgage; and (2) reevaluate her eligibility for a permanent modification in contravention of HAMP directives. The district court dismissed this fraudulent concealment claim due to "the absence of any fiduciary or other duty to speak" on the

part of Wells Fargo as a mortgagee. See *Graham v. Midland Mortg. Co.*, 406 F. Supp. 2d 948, 953 (N.D. Ill. 2005) ("A mortgagor-mortgagee relationship does not create a fiduciary relationship as a matter of law."), quoting *Teachers Ins. & Annuity Ass'n of America v. LaSalle Nat'l Bank*, 691 N.E.2d 881, 888 (Ill. App. 1998). In the district court, Wigod apparently conceded that Wells Fargo was not a fiduciary under Illinois law, but she argued that she placed a special trust and confidence in the bank as her HAMP servicer. The district court rejected this theory on the ground that any special trust relationship between Wigod and Wells Fargo existed solely through the lender's participation in HAMP, which does not provide the borrower with a private right of action.

For two reasons, we affirm the dismissal of the fraudulent concealment claim. First, Wigod's special trust argument is waived: in this appeal, Wigod raised the issue only in her reply brief, and arguments raised for the first time in a reply brief are waived. *Padula v. Leimbach*, 656 F.3d 595, 605 (7th Cir. 2011). Second, even if we overlooked the waiver, we would agree with the district court that no special trust relationship existed here. Wells Fargo's participation in HAMP is not sufficient to create a special trust relationship with Wigod and the roughly 250,000 other homeowners with whom it entered TPP Agreements. The Illinois Appellate Court has recently stated that the standard for identifying a special trust relationship is "extremely similar to that of a fiduciary relationship." *Benson v. Stafford*, 941 N.E.2d 386, 403 (Ill. App. 2010).

Accordingly, state and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary one. See, *e.g.*, *Go For It, Inc. v. Aircraft Sales Corp.*, No. 02 C 6158, 2003 WL 21504600, at *2 (N.D. Ill. June 27, 2003) (finding no confidential relationship in sale of airplane because "the parties' relationship did not possess sufficient indicia of disparity in experience or knowledge such that defendants could be said to have gained influence and superiority over the plaintiff," since "a slightly dominant business position does not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship"); *Benson*, 941 N.E.2d at 403 (declining to find special trust relationship between options traders who had formed joint ventures because the plaintiffs alleging fraud could not show "that they trusted defendant" or that the defendant was in "a position of influence and superiority"); *Martin v. State Farm Mutual Auto. Ins. Co.*, 808 N.E.2d 47, 52 (Ill. App. 2004) (finding that holders of automobile insurance policy did not have a special trust relationship with their insurer because "[t]here are no allegations of a history of dealings or long-standing relationship between the parties, or that plaintiffs had entrusted the handling of their insurance affairs to State Farm in the past, or that State Farm was in a position of such superiority and influence by reason of friendship, agency, or experience"); *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 13-14 (Ill. App. 2001) (holding that the "arms length transaction" between a car dealer and a prospective customer "did not give rise to a confidential relationship sufficient to impose a

general duty of disclosure under the fairly rigorous principles of common law" because "this dealer-customer relationship did not possess sufficient indicia of disparity in experience or knowledge such that the dealer could be said to have gained influence and superiority over the purchaser."). But see *Schrager v. North Community Bank*, 767 N.E.2d 376, 386 (Ill. App. 2002) (finding, despite absence of fiduciary relationship, that special trust relationship existed between the plaintiff, an investor in a real estate venture, and the defendant bank who had induced the plaintiff to invest, "because defendants' superior knowledge and experience of [the developers' problematic] financial history, as well as the status of the . . . development project, including the necessity of a fresh guarantor, placed defendants in a position of influence over" the plaintiff).

The special relationship threshold is a high one: "the defendant must be 'clearly dominant, either because of superior knowledge of the matter derived from . . . overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side.'" *Miller*, 762 N.E.2d at 13 (internal quotation marks omitted), quoting *Mitchell v. Norman James Construction Co.*, 684 N.E.2d 872, 879 (Ill. App. 1997). As the *Mitchell* court explained:

> Factors to be considered in determining the existence of a confidential relationship include the degree of kinship of the parties; any disparity in age, health, and mental condition; differences in education and business experience between the parties; and the

extent to which the allegedly servient party en-
trusted the handling of her business affairs to the
dominant party, and whether the dominant party
accepted such entrustment.

684 N.E.2d at 879. In short, the defendant accused of
fraudulent concealment must exercise "overwhelming
influence" over the plaintiff. *Miller*, 762 N.E.2d at 14.

In light of the weight of Illinois authority, Wells
Fargo's role as a HAMP servicer was not sufficient to find
a special trust relationship with Wigod with respect
to negotiating any modification. She claims that "HAMP
requires servicers to provide borrowers with informa-
tion to help them 'understand the modification terms'
and to 'minimize potential borrower confusion,'" and
that she "relied on Wells Fargo to convey accurate infor-
mation about the Program." Reply Br. at 33. That may
be so, but asymmetric information alone does not show
the degree of dominance needed to establish a special
trust relationship. See *Miller,* 762 N.E.2d at 13-14. Other-
wise, virtually any mortgage lender would have a
special trust relationship with its borrowers, regardless
of HAMP participation — a proposition Illinois courts
have clearly rejected. See, *e.g.*, *id.*, 762 N.E.2d at 14
("Like the conventional mortgagor-mortgagee relation-
ship that the *Mitchell* court found to fall short of a confi-
dential relationship, this dealer-customer relationship
did not possess sufficient indicia of disparity in ex-
perience or knowledge such that the dealer could be
said to have gained influence and superiority over the
purchaser."); *Mitchell*, 684 N.E.2d at 879 ("As a matter

of law, a conventional mortgagor-mortgagee relation-ship standing alone does not give rise to a fiduciary or confidential relationship.").[10] The HAMP modification is an arm's-length transaction between servicer and borrower, no less than is a home mortgage loan itself. By becoming Wigod's HAMP servicer, Wells Fargo did not assume significant additional responsibility for han-dling Wigod's business affairs. Like the original mort-gagor-mortgagee relationship itself, the relevant aspects of the HAMP servicer-borrower relationship do not bear the fiduciary-like hallmarks of a special trust rela-tionship under Illinois law. We affirm the dismissal of Wigod's fraudulent concealment claim.

E. *Negligent Misrepresentation or Concealment*

In the alternative to her fraudulent misrepresenta-tion and concealment claims, Wigod alleges that Wells Fargo negligently or carelessly (rather than intentionally) misrepresented or omitted material facts. Negligent

---

[10] Illinois recognizes that a mortgagee owes a fiduciary duty to a mortgagor in some narrow aspects of the relationship, such as when the mortgagor retains control of borrowed money to pay expenses as an agent for the mortgagor, such as title insurance costs, as in *Janes v. First Federal Savings and Loan Ass'n of Berwyn*, 312 N.E.2d 605, 610-11 (Ill. 1974). See also *Orman v. Charles Schwab & Co.*, 688 N.E.2d 620, 621 (Ill. 1997). Wigod's claim does not implicate those aspects of the rela-tionship where the mortgagee acts as an agent for the mortgagor-principal and has a fiduciary duty to the mortgagor.

misrepresentation involves the same elements as fraudulent misrepresentation, except that (1) the defendant need not have known that the statement was false, but must merely have been negligent in failing to ascertain the truth of his statement; and (2) the defendant must have owed the plaintiff a duty to provide accurate information. See *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 876 N.E.2d 218, 228 (Ill. App. 2007).[11]

Whether or not Wigod has successfully pled the elements of negligent misrepresentation and concealment, this claim is also barred by the economic loss doctrine. Any duty Wells Fargo may have had to provide accurate information to Wigod arose directly from their

---

[11] There is a dearth of Illinois case law on negligent concealment, and we can identify no cases that actually set forth the elements of the tort. One state appellate judge has denied that it is a distinct cause of action, at least in the context of contractor liability. See *Moore v. Everett Snodgrass, Inc.*, 408 N.E.2d 1166, 1172 (Ill. App. 1980) (Stouder, J., concurring in part and dissenting in part) ("it is obvious that merely negligent concealment, without some type of fraud or intent to deceive, is not enough to make the contractor liable"). Nevertheless, the Illinois courts do appear to accept it, at least in theory, even if its contours remain nebulous. See *id*. at 1170 (majority opinion). We assume the elements of negligent concealment are equivalent to those of a negligent misrepresentation claim, meaning the defendant must have negligently — but not intentionally — failed to disclose a material fact, and that he also must have owed some duty to the plaintiff to disclose it (which is also a requirement of the fraudulent concealment tort).

commercial and contractual relationship. Wigod is right that HAMP requires servicers to help borrowers understand the modification terms. But this obligation is not owed to the general public — only to mortgagors in the HAMP modification process. If Wells Fargo had such obligations to Wigod, then, it was only because it executed a TPP agreement with her under HAMP. Any disclosure duties owed here are contractual ones and therefore do not sound in the torts of negligent misrepresentation or negligent concealment. We affirm the dismissal of these claims, and proceed to Wigod's final cause of action.[12]

F.    *The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA)*

The ICFA protects consumers against "unfair or deceptive acts or practices," including "fraud," "false promise," and the "misrepresentation or the concealment, suppression or omission of any material fact." 815 ILCS 505/2. The Act is "liberally construed to effectuate its purpose."

---

[12] The same analysis of course would apply to Wigod's claim for fraudulent concealment, which also requires the existence of a duty to disclose. But recall that the *Moorman* doctrine admits an exception for claims alleging fraud. This exception saves the fraudulent concealment claim but not the negligent misrepresentation or concealment claim. See, *e.g.*, *Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 475-77 (7th Cir. 1997) (applying *Moorman* doctrine to bar claim for negligent misrepresentation).

*Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). The elements of a claim under the ICFA are: "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010), citing *Robinson*, 775 N.E.2d at 960. In addition, "a plaintiff must demonstrate that the defendant's conduct is the proximate cause of the injury." *Id*. at 935.

Wigod accuses Wells Fargo of practices that are both deceptive and unfair. In her complaint, Wigod incorporates by reference her common-law fraud claims, alleging that Wells Fargo's misrepresentation and concealment of material facts constituted deceptive business practices. Compl. ¶¶ 123-25. She also alleges that Wells Fargo dishonestly and ineffectually implemented HAMP, and that this conduct constituted "unfair, immoral, unscrupulous business practices." Compl. ¶ 126. The district court dismissed Wigod's ICFA claim on two grounds: first, because Wigod did not allege that Wells Fargo acted with an intent to deceive her; and second, because Wigod did not plausibly plead that Wells Fargo's conduct caused her any actual pecuniary injury. On both points, we disagree.

First, "intent to deceive" is not a required element of a claim under the ICFA, which provides redress "not only for deceptive business practices, but also for business practices that, while not deceptive, are unfair." *Boyd v.*

*U.S. Bank, N.A. ex rel. Sasco Aames Mortg. Loan Trust Series 2003-1*, 787 F. Supp. 2d 747, 751 (N.D. Ill. 2011) (holding that a loan servicer's alleged failure to consider the plaintiff's eligibility for a HAMP modification was a sufficient predicate for an ICFA claim); see 815 ILCS 505/2 ("[U]nfair *or* deceptive acts or practices . . . are hereby declared unlawful . . . .") (emphasis added); *Siegel*, 612 F.3d at 934-35 ("A plaintiff may allege that conduct is unfair under ICFA without alleging that the conduct is deceptive."), citing *Saunders v. Michigan Ave. Nat'l Bank*, 662 N.E.2d 602, 608 (Ill. App. 1996). Wigod alleges that Wells Fargo engaged in both deceptive (fraudulent) and unfair business practices. Moreover, even if she had alleged only deceptive practices, pleading intent would still be unnecessary, since a "claim for 'deceptive' business practices under the Consumer Fraud Act does not require proof of intent to deceive*." Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1044 n.5 (N.D. Ill. 2007), *aff'd*, 612 F.3d 932.[13] It is enough to allege that the defendant

---

[13] Accord *Chow v. Aegis Mortg. Corp.*, 286 F. Supp. 2d 956, 963 (N.D. Ill. 2003) ("To satisfy [the ICFA's] intent requirement, plaintiff need not show that defendant intended to deceive the plaintiff, but only that the defendant intended the plaintiff to rely on the (intentionally or unintentionally) deceptive information given."); *Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 558 (Ill. App. 2003) ("A defendant need not have intended to deceive the plaintiff; innocent misrepresentations or omissions intended to induce the plaintiff's reliance are actionable under [the ICFA]."); *Grove v. Huffman*, 634 N.E.2d

(continued...)

committed a deceptive or unfair act and intended that the plaintiff rely on that act, and Wigod has done so.

The district court also concluded that Wigod did not identify any "actual pecuniary loss" that she suffered. Because Wigod's reduced trial plan payments were less than the amount she was legally obliged to pay Wells Fargo under the terms of her original loan documents, the court reasoned that Wigod was better off than she would have been without the TPP. This reasoning overlooks Wigod's allegations that she incurred costs and fees, lost other opportunities to save her home, suffered a negative impact to her credit, never received a Modification Agreement, and lost her ability to receive incentive payments during the first five years of the modification. Prior to entering the trial plan, Wigod also could have taken the path of "efficient breach" and defaulted immediately rather than executing the TPP and making trial payments. By the time Wigod realized she would not receive the permanent modification she believed she had been promised, late fees had mounted and she found herself in default on her loan and with fewer options than when the trial period began. Whether any of these alternatives might have saved her home, or

---

[13] (...continued)
1184, 1188 (Ill. App. 1994) ("Courts of this State have consistently held that [the ICFA] applies to innocent misrepresentations."); *Duran v. Leslie Oldsmobile, Inc.*, 594 N.E.2d 1355, 1361 (Ill. App. 1992) ("The Consumer Fraud Act eliminated the requirement of *scienter*, and innocent misrepresentations are actionable as statutory fraud.").

at least cut her losses, is impossible to determine from the pleadings. Her allegations are at least plausible. She has alleged pecuniary injury caused by Wells Fargo's deception and successfully pled the elements of an ICFA violation. Accord *Boyd*, 787 F. Supp. 2d at 754 (allegations of "damage to [homeowner's] credit" and "the inability 'to fairly negotiate a plan to stay in [his] home'" sufficiently pled economic damages under the ICFA); *In re Bank of America Home Affordable Modification (HAMP) Contract Litigation*, No. 10-md-02193-RWZ, 2011 WL 2637222, at *5-6 (D. Mass. July 6, 2011) (multi-district litigation) (denying motion to dismiss claims under fourteen states, consumer protection acts, including the ICFA).[14]

---

[14] In a number of third-generation HAMP cases, district courts have found that plaintiffs successfully pled claims under other states' analogous consumer fraud statutes. See, *e.g.*, *Allen v. CitiMortgage, Inc.*, No. CCB-10-2740, 2011 WL 3425665, at *10 (D. Md. Aug. 4, 2011) ("The plaintiffs have alleged that CitiMortgage's misleading letters led to the following damages: damage to Mrs. Allen's credit score, emotional damages, and forgone alternative legal remedies to save their home. Accordingly, at this stage, the plaintiffs have stated sufficiently an actual injury or loss as a result of a prohibited practice under [the Maryland Consumer Protection Act]."); *Stagikas v. Saxon Mortg. Services, Inc.*, 795 F. Supp. 2d 129, 137 (D. Mass. 2011) ("The complaint also alleges several injuries resulting from defendant's allegedly deceptive representations about plaintiff's HAMP eligibility, including increased interest on the debt, a negative impact on plaintiff's credit

(continued...)

III. *Preemption and the "End-Run" Theory*

We have now determined that Wigod has plausibly stated four claims arising under state law: breach of contract, promissory estoppel, fraudulent misrepresentation, and violation of the ICFA. We next examine whether federal law preempts or otherwise displaces them. "Preemption can take on three different forms: express preemption, field preemption, and conflict preemption." *Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008). Wells Fargo concedes that Wigod's claims are not expressly preempted, but argues for both field preemption and conflict preemption. Wells Fargo also advances the novel theory that Wigod's claims are displaced because they attempt an "end-run" on the lack of a private right of action under HAMP itself. We reject this "end-run" theory, along with Wells Fargo's formal preemption arguments. Federal law does not displace Wigod's state-law claims.

A. *Field Preemption*

In all preemption cases, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the

14 (...continued)
history, and the loss of other economic benefits of the loan modification. That is enough to sustain a claim of injury under [the Massachusetts Consumer Protection Act].") (internal citation omitted).

clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation marks omitted), quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Under the doctrine of field preemption, however, a state law is preempted "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted), quoting *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982).

Wells Fargo argues that the Home Owners Loan Act (HOLA) occupies the relevant field. Enacted to provide emergency relief from massive home loan defaults during the Great Depression, HOLA "empowered what is now the Office of Thrift Supervision [OTS] in the Treasury Department to authorize the creation of federal savings and loan associations, to regulate them, and by its regulations to preempt conflicting state law." *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litigation*, 491 F.3d 638, 642 (7th Cir. 2007). In one of its regulations, OTS announced that it "hereby occupies the entire field of lending regulation for federal savings associations." 12 C.F.R. § 560.2(a). In the same section, however, the regulation contains the following saving clause: state tort, contract, and commercial laws are "not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." 12 C.F.R. § 560.2(c). Read together, these provisions mean that state laws that establish licensing,

registration, or other requirements specific to financial institutions cannot be applied to national banks, while laws of general applicability survive preemption so long as they do not effectively impose standards that conflict with federal ones. Cf. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) ("Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of [federal banking law].") (analyzing preemption under the National Bank Act, which is applied analogously to HOLA).[15]

Arguing for field preemption, Wells Fargo contends that HOLA and the corresponding OTS regulations displace state common-law suits that effectively impose any standards for the processing and servicing of mortgage loans, whether they conflict with federal policy or not. This argument is directly at odds with the saving clause of 12 C.F.R. § 560.2(c), and inconsistent with our decision in *Ocwen*. There we noted that HOLA gave OTS the "exclusive authority to regulate the savings and loan industry in the sense of fixing fees (including penalties), setting licensing requirements, prescribing certain terms in mortgages, establishing requirements for disclosure of credit information to

---

[15] Regulations, as much as statutes, may have preemptive force. See *Wyeth*, 555 U.S. at 576 ("This Court has recognized that an agency regulation with the force of law can pre-empt conflicting state requirements."); *De la Cuesta*, 458 U.S. at 153 ("Federal regulations have no less pre-emptive effect than federal statutes.").

customers, and setting standards for processing and servicing mortgages." 491 F.3d at 643. Despite its regulatory authority, however, OTS "has no power to adjudicate disputes between [savings and loan associations] and their customers," and "HOLA creates no private right to sue to enforce the provisions of the statute or the OTS's regulations." *Id*. "Against this background of limited remedial authority," we held that HOLA and the OTS regulations did not preempt suits by "persons harmed by the wrongful acts of savings and loan associations" seeking "basic state common-law-type remedies," and we allowed state-law claims like those in this case — breach of contract, fraud, and violation of consumer protection statutes — to go forward. *Id*. Some federal statutes do receive such wide berths as to displace virtually all state laws in the neighborhood. (The National Labor Relations Act and ERISA are the best examples.) Such laws are "exceptional," though, and HOLA is not one of them. *Id.* at 644. *Ocwen* thus stands for the principle that HOLA preempts generally applicable state laws only when they "could interfere with federal regulation" — that is, those that actually conflict with the regulatory program. *Id*. at 646. We decline to disturb this holding, which forecloses Wells Fargo's argument for field preemption.

B. *Conflict Preemption*

The Supreme Court has "found implied conflict pre-emption where" either (1) "it is impossible for a private party to comply with both state and federal re-

quirements," or (2) "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal quotation marks omitted). Wells Fargo does not contend that it would be impossible, without violating federal law, for it to comply with the state-law duties Wigod's suit seeks to impose. Instead, it invokes the second species of conflict preemption, which is known as "obstacle" preemption. Wells Fargo says that entertaining Wigod's state-law claims here would undermine the purposes of Congress in two ways: First, it would "substantially interfere with Wells Fargo's ability to service residential mortgage loans" in accordance with HOLA and OTS regulations.[16] Second, it would "frustrate Congressional objectives in enacting [the 2008 Act] . . . to stabilize the economy and provide a program to mitigate 'avoidable' foreclosures."

The first argument for obstacle preemption, like Wells Fargo's theory of field preemption, is inconsistent with *Ocwen*. There we held that the plaintiff-mortgagors' "conventional" state law claims against a federal savings and loan association for breach of contract, fraud, and deceptive business practices complemented rather than conflicted with HOLA:

> Suppose an S & L signs a mortgage agreement with a homeowner that specifies an annual interest rate of

---

[16] In Wells Fargo's brief, this argument appears in the section on field preemption. Because in substance it is an argument for conflict preemption, we address it here.

6 percent and a year later bills the homeowner at a rate of 10 percent and when the homeowner refuses to pay institutes foreclosure proceedings. It would be surprising for a federal regulation to forbid the homeowner's state to give the homeowner a defense based on the mortgagee's breach of contract. Or if the mortgagee . . . fraudulently represents to the mortgagor that it will forgive a default, and then forecloses, it would be surprising for a federal regulation to bar a suit for fraud. . . . Enforcement of state law in either of the mortgage-servicing examples above would complement rather than substitute for the federal regulatory scheme.

*Ocwen*, 491 F.3d at 643-44. In our attempt to untangle in that case the complaint's "gallimaufry" of alleged "skull-duggery," we distinguished claims asserting "conventional" misrepresentation or breach of contract (which were not preempted) from those that would have effectively imposed state-law rules governing mortgage servicing and thereby "interfere[d] with federal regulation of disclosure, fees, and credit terms" (which were preempted). *Id*. at 644-46. Thus a claim under Connecticut's consumer protection statute alleging "exorbitant and usurious mortgages" was preempted, while "straight fraud claims" arising under both state common-law and consumer fraud statutes were not preempted. *Id*. at 647 (internal quotation mark omitted).

Wells Fargo appears to concede, as it must in light of *Ocwen*, that HOLA does not preempt Wigod's breach of contract claim or her common-law fraudulent represen-

tation claim. Wells Fargo nevertheless maintains that conflict preemption principles bar Wigod's ICFA claims, attempting to distinguish *Ocwen* by arguing that these claims "would necessarily establish new standards for servicers' customer relation policies." The argument is not persuasive. The gist of Wigod's ICFA claims is that Wells Fargo failed to disclose that it was going to reevaluate her eligibility for a permanent modification — contrary to the terms of both her TPP and HAMP program guidelines — and that it deceived her into believing it would modify her mortgage. Allowing these claims to proceed against Wells Fargo would not create state-law duties for servicing home mortgages, let alone ones that "actually conflict" with HOLA "or federal standards promulgated thereunder." See *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000). In *Ocwen*, we found that the "straight fraud claims" arising under various state consumer protection statutes were not subject to conflict preemption under HOLA. 491 F.3d at 644-45, 647. Here, too, Wigod's ICFA claims "sound[ ] like conventional fraud charge[s]," the prosecution of which appears perfectly consistent with federal mortgage rules. *Id*. at 645. HOLA does not preempt them.

Wells Fargo's second conflict preemption theory is that a finding of liability in Wigod's suit would frustrate Congressional objectives in enacting the 2008 Act that authorized HAMP. Wells Fargo argues that claims like Wigod's would generate such friction in three ways: First, they would force servicers to modify mort-

gages in violation of both Treasury directives and the servicers' contractual obligations to the government. Second, they would invite many uncoordinated law-suits, exposing servicers to varying standards of con-duct. Third, they would discourage servicers from partici-pating in HAMP. The arguments are not persuasive.

The first theory is inapplicable because none of Wigod's claims, at least as she has framed them, would impose on Wells Fargo any duties that go beyond its existing obligations under HAMP. As Wigod puts it, "if Wells Fargo followed the letter of the Program it would not have breached its contracts, acted negligently or fraudu-lently, or violated the ICFA." The whole thrust of this suit is that Wells Fargo failed to do what it agreed to do and what *HAMP required* it to do. The breach of contract and fraudulent misrepresentation claims allege that the TPP Agreement required Wells Fargo to offer Wigod a modification if she qualified under HAMP — and that she did and it didn't.

One Wells Fargo defense, among others, will be that Wigod was not actually qualified, but that presents a factual dispute that cannot be resolved now. Likewise, the ICFA claim alleges that Wells Fargo failed to disclose that it would not follow HAMP guidelines. Again, it would be a complete defense that Wells Fargo did follow HAMP guidelines as they were incorporated into the terms of Wigod's TPP, but that also presents a factual issue. For each of these claims, the state-law duty allegedly breached is imported from and delimited by federal standards established in HAMP's program

guidelines. Where federal law supplies the standard of care imposed by state law, it is hard to see how they could conflict. See, *e.g.*, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 448 (2005) ("a state cause of action that seeks to enforce a federal requirement 'does not impose a requirement that is different from, or in addition to, requirements under federal law.'") (internal quotation marks omitted), quoting *Lohr*, 518 U.S. at 513 (O'Connor, J., concurring in part and dissenting in part); *Lohr*, 518 U.S. at 495 (majority opinion) ("Nothing . . . denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements."); *Bausch v. Stryker Corp.*, 630 F.3d 546, 556 (7th Cir. 2010) (holding that the Food, Drug, and Cosmetic Act did not preempt the plaintiff's tort claims against medical device manu-facturer because the state tort duty allegedly breached was parallel to FDA regulations promulgated under the Act; "claims are not . . . preempted by federal law to the extent they are based on defendants' violations of federal law").

For the same reason, we do not foresee any possibility that permitting suits such as Wigod's will expose mortgage servicers to multiple and varied standards of conduct. So long as state laws do not impose substantive duties that go beyond HAMP's requirements, loan servicers need only comply with the federal program to avoid incurring state-law liability. This is not a case in which the federal requirements leave much room for interpretation, but to the extent Wigod's case hinges on

construing Treasury directives, they "present questions of law for the court to decide, not questions of fact for a jury to decide*." See *Bausch*, 630 F.3d at 556.

As for its contention that the potential exposure to state liability may discourage servicers from participating in HAMP, Wells Fargo may be right. But that is hardly an argument for conflict preemption. "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth*, 555 U.S. at 565, quoting *Lohr*, 518 U.S. at 485. "Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Bates*, 544 U.S. at 449, also quoting *Lohr*, 518 U.S. at 485. We can reasonably assume that one purpose of Congress in enacting the 2008 Act was to ensure mortgage servicers participated in the foreclosure mitigation programs it empowered Treasury to set up. But another goal was surely to prevent these banks from hoodwinking borrowers in the process. Nothing in the 2008 Act suggests that Congress saw servicer participation as the Act's paramount purpose that would trump any concerns about whether servicers were actually complying with the program and with their contractual obligations. See *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) ("no legislation pursues its purposes at all costs"). There is no indication that Congress meant to foreclose suits against servicers for violating state laws that impose obligations parallel to those established in a federal program.

In addition, Treasury's own HAMP directive states that servicers must implement the program in com-

pliance with state common law and statutes. See Supplemental Directive 09-01 ("Each servicer . . . must be aware of, and in full compliance with, all federal state, and local laws (including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions) . . . ."). This would be an odd provision if Treasury had anticipated that HAMP would preempt state-law claims, especially ones that mirror its own directives. In this context, the agency's own tacit view of its program's lack of preemptive force is entitled to some weight. See *Wyeth*, 555 U.S. at 577 (agencies "have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress'"), quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Geier*, 529 U.S. at 883 (placing "some weight" on agency's interpretation of its own regulation's objectives and its conclusion "that a tort suit . . . would 'stand as an obstacle to the accomplishment and execution' of those objectives") (internal citations and quotation marks omitted).

C. *The "End-Run" Theory*

Finally, Wells Fargo insists that Wigod's case cannot go forward because her allegations are "HAMP claims in disguise" and an "impermissible end-run around the lack of a private action in [the 2008 Act] and HAMP." This "end-run" theory was the primary basis on which

the district court dismissed Wigod's complaint. That court explained that "'the facts and allegations as pleaded in this case are premised chiefly on the terms and procedures set forth via HAMP and are not sufficiently independent to state a separate state law cause of action.'" *Wigod*, 2011 WL 250501, at *4, quoting *Vida v. One West Bank, F.S.B.*, No. 10-987-AC, 2010 WL 5148473, at *3-4 (D. Or. Dec. 13, 2010). Wells Fargo has developed the same theory before this court, arguing: "If Congress had intended courts to be adjudicating whether a borrower qualified for a loan modification under [the 2008 Act] or HAMP, it would have provided a private right of action — but it chose not to do so."

The end-run theory is built on the novel assumption that where Congress does not create a private right of action for violation of a federal law, no right of action may exist under state law, either. Wells Fargo and the district court appear to have conflated two distinct lines of cases — one involving the existence of a federal private right of action, see *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979), and the other about federal preemption of state law. Wells Fargo invokes *Touche Ross* for the proposition that "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." Appellee's Br. at 15, quoting *Touche Ross*, 442 U.S. at 572. If this case involved whether to recognize a federal right of action under HAMP, *Touche Ross* and its progeny would certainly weigh in favor of judicial caution. See *Karahalios v. Nat'l Federation of Federal Employees, Local 1263*, 489 U.S. 527, 533 (1989) ("It is also an 'elemental canon' of statutory construction

that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies [under federal law].”), quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). The issue here, however, is not whether federal law itself provides private remedies, but whether it displaces remedies otherwise available under state law. The absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law. See, *e.g.*, *Bates*, 544 U.S. at 448 (“although [the Federal Insecticide, Fungicide, and Rodenticide Act] does not provide a federal remedy to farmers and others who are injured as a result of a manufacturer’s violation of FIFRA’s labeling requirements, nothing in [the statute] precludes States from providing such a remedy”). To find otherwise would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead.

To appreciate the novelty of Wells Fargo’s argument, consider the many cases in which the Supreme Court has confronted issues of subject matter jurisdiction presented by state common-law claims that incorporate federal standards of conduct, without so much as a peep about whether state law may do so without being preempted. See, *e.g.*, *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312, 311, 315 (2005) (quiet title action brought under state law “turn[ed] on substantial question[ ] of federal law” because “the interpretation of the notice statute in the federal tax law” was

an "essential element of [plaintiff's] quiet title claim); *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 805-07 (1986) (violation of federal labeling require- ments in the Federal Food, Drug, and Cosmetic Act created a rebuttable presumption of negligence and prox- imate cause under state tort law); *Moore v. Chesapeake & Ohio Ry.*, 291 U.S. 205, 214-15 (1934) (Kentucky worker's compensation statute provided that employer railroad's violation of Federal Safety Appliance Acts would constitute negligence per se under state law).

Of course, these well-known cases grappled with an issue different from the one before this court: whether the presence of a federal issue in a state-created cause of action gives rise to federal question jurisdiction under 28 U.S.C. § 1331. In none of these cases has the Supreme Court even suggested that the absence of a private right of action under a federal statute would prevent state law from providing a cause of action based in whole or in part on violations of the federal law. When the issue is whether "arising under" jurisdiction is available, Congressional silence matters a great deal, for our jurisdiction under § 1331 is determined by Congress. See *Merrell Dow*, 478 U.S. at 812 (stating that it would "undermine . . . congressional intent to . . . exercise fed- eral-question jurisdiction and provide remedies for viola- tions of [a] federal statute" that contains no private right of action, "solely because the violation of the federal statute" is an element of state law claim).

When the federal court's jurisdiction over state-law claims is based on diversity of citizenship, however, the

absence of a private right of action in a federal statute actually weighs *against* preemption. See, *e.g.*, *Wyeth*, 555 U.S. at 574 ("Congress did not provide a federal remedy for consumers harmed by unsafe or ineffective drugs in the 1938 statute or in any subsequent amendment. Evidently, it determined that widely available state rights of action provided appropriate relief for injured consumers."). We realize that Wells Fargo does not style its "end-run" theory as a preemption argument. But in the absence of any other doctrinal foundation for it, we see no other way to classify it. As Judge Hibbler wrote in one of the HAMP cases in which claims under Illinois law survived a motion to dismiss,

> [There is no] general rule that where a state common law theory provides for liability for conduct that is also violative of federal law, a suit under the state common law is prohibited so long as the federal law does not provide for a private right of action. Indeed, it seems the only justification for such a rule would be federal preemption of state law.

*Fletcher v. OneWest Bank, FSB*, No. 10 C 4682, 2011 WL 2648606, at *4 (N.D. Ill. June 30, 2011); see also *Bosque*, 762 F. Supp. 2d at 351 ("The fact that a TPP has a relationship to a federal statute and regulations does not require the dismissal of any state-law claims that arise under a TPP."). In short, a state-law claim's incorporation of federal law has never been regarded as disabling, whether the federal law has a private right of action or not. See *Grable & Sons*, 545 U.S. at 318-19 ("The violation of federal statutes and regulations is commonly given

negligence per se effect in state tort proceedings."), quoting Restatement (Third) of Torts § 14, Reporters' Note, cmt. *a*, p. 195 (Tent. Draft No. 1, Mar. 28, 2001); *Merrell Dow*, 478 U.S. at 816 ("violation of the federal standard as an element of state tort recovery did not fundamentally change the state tort nature of the action"); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* § 36, p. 221, n.9 (5th ed. 1984) ("the breach of a federal statute may support a negligence per se claim as a matter of state law").

Wells Fargo has tried to find some support for its end-run theory in two Second Circuit cases involving very different statutes. In *Grochowski v. Phoenix Construction*, 318 F.3d 80 (2d Cir. 2003), a construction contract between the City of New York and some general contractors required the latter to pay their laborers in accordance with the Davis-Bacon Act (DBA), a federal law that accords no private right of action, at least under Second Circuit precedent.[17] The contractors did not do so, and their laborers sued them under New York common law for breach of contract as third-party beneficiaries. The district court granted the contractors' motion to dismiss. A divided panel of the Second Circuit affirmed, reasoning that "no private right of action exists under" the DBA and that "the plaintiffs' efforts to bring their

---

[17] Compare *Chan v. City of New York*, 1 F.3d 96, 103 (2d Cir. 1993) (holding that DBA confers no private right of action), with *McDaniel v. University of Chicago*, 548 F.2d 689, 695 (7th Cir. 1977) (finding private right of action in the DBA).

claims as state common-law claims are clearly an impermissible '*end run*' around the DBA." *Id*. at 86 (emphasis added). The majority's only elaboration of this theory was the following:

> At bottom, the plaintiffs' state-law claims are indirect attempts at privately enforcing the prevailing wage schedules contained in the DBA. To allow a third-party private contract action aimed at enforcing those wage schedules would be "inconsistent with the underlying purpose of the legislative scheme and would interfere with the implementation of that scheme to the same extent as would a cause of action directly under the statute." *Davis v. United Air Lines, Inc.*, 575 F. Supp. 677, 680 (E.D.N.Y. 1983).

*Grochowski*, 318 F.3d at 86.

Judge Lynch dissented, criticizing the majority's reliance on the "proposition[ ] that the plaintiffs may not make an 'end-run' around the absence of a private right of action" in the DBA.

> That, I respectfully submit, is a slogan, not an argument. And it is an erroneous slogan at that. . . .
>
> . . . The majority fails to cite any actual evidence, in the language or legislative history of the DBA, that Congress intended to prevent state law contract suits based on contractual promises to pay DBA prevailing wages — promises that Congress specifically required to be written into *contracts* that it must have assumed would be enforceable, like any other contracts, under state law. . . .

> . . . If New York law provides a right or remedy, any plaintiff has an absolute right to invoke it, unless the New York law is contrary to or pre-empted by federal law. But the majority does not even make a pass at demonstrating that the DBA displaces state contract law, or that New York's willingness to enforce contractual promises to pay the prevailing wage is contrary to, rather than supportive of, the federal policy embodied in the DBA.

*Id*. at 90-91 (Lynch, J., dissenting in part). We think Judge Lynch has the better of this argument.[18] The end-run

---

[18] As it happens, so did the New York Court of Appeals, which unanimously endorsed Judge Lynch's interpretation of New York common law and held that "when a contractor has promised to pay its workers the prevailing wages required by the United States Housing Act, the workers may sue under state law to enforce the promise" as a third-party beneficiary. *Cox v. NAP Construction Co.*, 891 N.E.2d 271, 273 (N.Y. 2008). The court dismissed the end-run theory in *Grochowski* as "flawed": "We agree with Judge Lynch . . . . To say that Congress, in enacting the DBA, did not intend to create a federal right of action is not to say that Congress intended to prohibit, or preempt, state claims." This raises a further puzzle with respect to the end-run theory. If a state court — or legislature, for that matter — expressly creates a state-law remedy for a violation of a federal law that lacks a private right of action, do federal courts have the authority to abrogate it under the Supremacy Clause? If the end-run theory were a species of federal preemption, the answer would clearly be yes. See, *e.g.*, *Rose v. Arkansas State Police*, 479 U.S. 1, 3 (1986) (per curiam)

(continued...)

theory, as it is described by the majority, bears a striking resemblance to obstacle preemption, with its reference to the state law's "inconsisten[cy] with the underlying purpose of the [federal] regulatory scheme." *Id*. at 86. Yet, as Judge Lynch pointed out, there is no evidence that Congressional intent — the touchstone of any preemption inquiry — was to preempt state law with the DBA. It seems to us that the *Grochowski* end-run theory is really just an "end-run" around well-

---

[18] (...continued)

("There can be no dispute that the Supremacy Clause invalidates all state laws that conflict or interfere with an Act of Congress."); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824) ("In every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it."). But the interplay between the Second Circuit and the New York Court of Appeals in *Grochowski* and *Cox* suggests that some other legal principle was at work. The confusion further convinces us that the end-run theory lies in a doctrinal no-man's land, and its adoption would upset a century or two of preemption and arising-under jurisdictional precedents. See, *e.g.*, *Gully v. First National Bank*, 299 U.S. 109, 115 (1936) ("Not every question of federal law emerging in a suit is proof that a federal law is the basis of the suit."); see also *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 215 (1921) (Holmes, J., dissenting) ("The mere adoption by a State law of a United States law as a criterion or test, when the law of the United States has no force *proprio vigore*, does not cause a case under the State law to be also a case under the law of the United States, and so it has been decided by this Court again and again.").

established preemption doctrine, and we decline to adopt it.[19]

Wells Fargo also cites *Broder v. Cablevision Systems Corp.*, 418 F.3d 187 (2d Cir. 2005), which contains a brief and tepid reference to *Grochowski*. The case involved a cable television provider that extended a discounted rate to certain customers without offering or disclosing it to others — a practice the plaintiff alleged to violate both

---

[19] To the extent the Supreme Court's citation of *Grochowski* in *Astra USA, Inc. v. Santa Clara County*, 131 S. Ct. 1342 (2011), connotes an endorsement, we think it is limited to the third-party beneficiary context. See *Astra*, 131 S. Ct. at 1348 (citing *Grochowski* as holding that "when a government contract confirms a statutory obligation, 'a third-party private contract action [to enforce that obligation] would be inconsistent with . . . the legislative scheme . . . to the same extent as would a cause of action directly under the statute'"). In any third-party beneficiary case, a "nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend." *Id*. In *Astra*, the absence of a private right of action in the federal program was important because it showed that Congress did not intend plaintiffs to be third-party beneficiaries. See *id*. In this case, however, the question is not whether HAMP mortgagors were intended third-party beneficiaries of the federal contracts with servicers but whether Congress intended to preclude them from enforcing contracts to which they themselves were parties. That is a preemption question not addressed in *Astra*, which mentions preemption only once, in a footnote dealing with a tertiary issue on which the Court took no position. *Id*. at 1349 n.5.

the federal Consumer Protection and Competition Act (CPCA) and a New York state statute. Neither law, however, provided for a private right of action, so the plaintiff sued for common-law breach of contract and fraud and for deceptive practices under the New York General Business Law. The Second Circuit affirmed the dismissal of the plaintiff's breach of contract claim on the ground that "the contract language . . . unambiguously foreclose[d] his claims." *Broder*, 418 F.3d at 197. The court did not rely on *Grochowski*, but noted that the district court had embraced its end-run theory in an "alternative ground of decision." *Broder*, 418 F.3d at 198 (emphasis added). The panel wrote:

> However narrow or broad the proper interpretation of our holding in *Grochowski* may be, that case stands at least for the proposition that a federal court should not strain to find in a contract a state-law right of action for violation of a federal law under which no private right of action exists.

*Broder*, 418 F.3d at 198. Here, however, we have found that Wigod has alleged a breach of contract claim under the plain language of the TPP agreement, with no "straining" required to reach this conclusion. Thus, even if *Broder* had endorsed *Grochowski*'s end-run theory, and even if it had done so in its holding rather than in dicta, it would not apply to Wigod's breach of contract claim.

The end-run theory made a second appearance in *Broder* during the court's discussion of the plaintiff's deceptive practices claims under the New York General Business Law, although the court did not call it that or

even cite *Grochowski*. Instead, the court used the term "circumvention," holding that the plaintiff was not allowed to "circumvent the lack of a private right of action for violation of" the CPCA by alleging that non-uniform rates were deceptive under state law. *Id.* at 199. From Congress's omission of a private right of action in the CPCA, the court inferred that it intended to fore-close state remedies as well, and declined to "attribute[ ] to the New York legislature an intent to thwart Congress's intentions." *Id.*

We find that inference difficult to reconcile with cases like *Bates*, 544 U.S. at 448, and *Wyeth*, 555 U.S. at 574, but it matters little since this part of *Broder*'s holding is easily distinguishable. *Broder* dealt with a different federal law altogether and expressly confined its holding to apply only to the CPCA. *Broder*, 418 F.3d at 199. Further-more, Wigod's ICFA claims do not allege that Wells Fargo engaged in unfair or deceptive business practices by violating HAMP guidelines. Rather, she contends that Wells Fargo's misrepresentation and omission of material facts misled her to believe she would receive a permanent modification under HAMP and that it imple-mented its HAMP compliance procedures in a way de-signed to thwart borrowers' legitimate expectations. The plaintiff in *Broder*, in contrast, alleged that Cablevision's violation of the CPCA's uniform rate requirement was itself a deceptive practice. In his reply brief to the Second Circuit, he refined his argument along the lines of Wigod's. The court indicated that this "subtler argu-ment" was more passable but declined to consider it because it was waived. *Id.* at 202. Wigod has made

this argument all along, and so her ICFA claims are not inconsistent with *Broder*.


IV. *Conclusion*

We predict that the Illinois courts would find some of Wigod's claims actionable under the laws of their state, and we can find no basis in the law of federal pre-emption that would bar those claims. The judgment of the district court is therefore REVERSED as to Counts I, II, and VII, and the fraudulent misrepresentation claim of Count V, and AFFIRMED as to Counts IV, VI, and the fraudulent concealment claim of Count V. The case is REMANDED for further proceedings on the surviving counts.


RIPPLE, *Circuit Judge*, concurring. I am very pleased to join the excellent opinion of the court written by Judge Hamilton. I write separately only to note that, in my view, our task of adjudicating this matter would have been assisted significantly if the United States had entered this case as an amicus curiae.

The Emergency Economic Stabilization Act, P.L. 110-343, 122 Stat. 3765, and the programs implemented under

its authority are of vital importance to the economic health of the Country. Prolonged litigation is hardly a catalyst to the effective administration of these programs. As the opinion for the court details with great care, the program at issue here has been the subject of many cases in the district courts. Efficient and accurate resolution in this court is important to the effective administration of the legislative program and, in that respect, the views of the executive department charged with the administration of the statute undoubtedly would have been of great assistance.

I hasten to add that, in suggesting that the participation of the United States would have been helpful to us, I do not mean to criticize in the least the efforts of counsel for the private parties before us. The perspective brought to a case such as this by the Government is simply different. It is uniquely qualified to express the purpose and the operation of the statute and to represent the public interest.

I also must qualify my view in another respect. From my vantage point, I am not privy, of course, to the myriad of considerations that must govern the allocation of legal resources in a Government whose legal talent is certainly not under-used. Indeed, the demands on those resources are overwhelming. It may well be that the participation of the Government in a case such as this one is simply not possible in the real world of limited resources in which we live.

I note that it is possible for the court to invite the Government's participation as an amicus in cases of such

public importance. Indeed, we do so with some regularity. There are, however, costs to proceeding in that manner. The need for such participation often becomes apparent only after there has been significant judicial scrutiny of the case. Such scrutiny is possible, at least in this circuit, only shortly before oral argument. As a practical matter, seeking the participation of the Government at that point in the life of an appellate case inevitably increases, often significantly, the elapsed time before final adjudication.

In this case, this last consideration justifies the decision to proceed without further delay. Prompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country. As the quality of my colleague's opinion reflects, moreover, there is no reason for further delay. Nevertheless, the salutary practice of the Government's participating in private litigation of public importance must remain alive and well in the tradition of the court.